STATE of Wisconsin, Plaintiff-Respondent,

v.

Lazaro CURBELLO-RODRIGUEZ, Defendant-Appellant.†

Court of Appeals

*No. 83–1335–CR. Submitted on briefs May 18, 1984.—*
*Decided May 25, 1984.*
(Also reported in 351 N.W.2d 758.)

† Petition to review denied. ABRAHAMSON, J., dissents.

418

For the defendant-appellant the cause was submitted on the briefs of *Judith Sperling Newton* and *Koritzinsky, Neider, Langer & Roberson* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Thomas J. Balistreri,* assistant attorney general.

Before Gartzke, P.J., Bablitch, J., and Bruce F. Beilfuss, Reserve Judge.

BEILFUSS, Reserve Judge. This is an appeal from a judgment of conviction and sentence, and order denying postconviction motions. The defendant-appellant, Lazaro Curbello-Rodriguez, was convicted by a jury of three counts of first degree sexual assault under sec. 940.225 (1) (c), Stats., six counts of first degree sexual assault as an aider and abettor under secs. 940.225 (1) (c) and 939.05, Stats., and one count of abduction under sec. 940.32 (3). He was sentenced to twenty years on each of the three sexual assault charges, to run consecutively; twenty years on the six aiding and abetting charges, to run concurrently with each other but consecutively to the other sentences; and ten years on the abduction charge, to run concurrently with the other sentences. The total sentence is eighty years. The issues on appeal are as follows:

1. Did the trial court err in holding that appellant did not have standing to challenge admission of a knife seized during an allegedly illegal search? If so, was the error harmless?

2. Did the trial court err in admitting an out-of-court statement into evidence?

3. Did the trial court err in instructing the jury on first rather than second degree sexual assault for the aiding and abetting charges?

4. Was the sentence an abuse of discretion?
We affirm.

## FACTS

On the evening of August 20, 1981, S.P., a sixteen-year-old girl, was visiting D.H. at her house in Madison, Wisconsin. The girls were later joined by R.L.

Late in the evening S.P. started to make arrangements to get home. After attempting unsuccessfully to obtain a ride, S.P. left with R.L. S.P. and R. L. met Armando

Garcia on a Madison street. R.L. indicated she knew Garcia from a party they had both attended. S.P. asked Garcia if she could borrow a dollar. Garcia stated he did not have a dollar with him, and invited the young women to his apartment where he would give them money. The young women accompanied Garcia to his apartment. There they encountered Curbello, Isidro Sosa and Wilfredo Corborberde.

The only English-speaking male in the group was Garcia. S.P. and R.L. did not speak Spanish. S.P. and R.L. sat at the kitchen table and smoked marijuana with the men. The men conversed with each other in Spanish. Two of the men made sexual advances toward the girls.

The young women, having decided they wanted to leave, announced they were going to the store to purchase soda and would come back. Sosa said "no," and, according to R.L., hit a bicycle chain against a chair. Garcia told the young women Sosa said he would go for soda. One of the men did leave and returned with soda.

When S.P. and R.L. later stated they had to leave, the men jumped up and went to different areas of the apartment. Sosa slammed the bicycle chain against a table and the chair in which S.P. was sitting, then turned the living room lights off and on. Someone turned up the music.

The young women thought they would not be allowed to leave. S.P. decided to say she was sick and had to go to the bathroom to get away from the men. She walked toward the bathroom. The appellant held onto her and Sosa walked in front of her. S.P. motioned to the outside door and the men said no. She noticed that the door had been chain locked. She then said she didn't have to go to the bathroom and tried to return to the table. The appellant attempted to pull her into the bathroom, and a struggle ensued. S.P. pushed her left arm against the door frame. Sosa grabbed her purse off her shoulder

and yanked her arm off the door. Appellant pulled her into the bathroom and shut the door. He tugged at her clothing, but she refused to undress. The appellant pulled out a folding knife, held it to and tugged at S.P.'s clothing. She removed her clothing. The appellant turned her around and bent her over the tub. S.P. feared he would cut her all the way down her back with the knife. Instead, he had anal intercourse with her. Afterwards, he set the knife on a bathroom shelf and had vaginal intercourse with her. Corborberde and Sosa entered the bathroom in immediate succession and had vaginal intercourse with S.P. Corborberde also had oral intercourse with S.P.

The appellant took S.P. into the bedroom where he had vaginal intercourse with her on a bed. Corborberde, Sosa and Garcia each took a turn having vaginal intercourse with S.P. in the bedroom. Each man ordered S.P. to bathe prior to his sexual contact with her and took her to the bathroom and observed her bathing. S.P. resisted and did not consent to any act of intercourse.

Before S.P. and R.L. left, the appellant pulled out his knife and motioned up and down his face or rubbed the knife while speaking in Spanish. According to Garcia's translation, appellant stated if the young women told anyone about what had occurred, he would cut them or hurt someone in their families. S.P. told the men that she would not tell anyone about the incident and would take them to a party that night. She did this so the men would not think she was angry and would allow the girls to leave.

S.P. returned to D.H's home, where she telephoned the police. The police arrested the men later that morning and transported them to the Dane County jail. Some of the officers returned, searched the apartment and seized certain items, including the appellant's knife.

## I. ADMISSIBILITY OF KNIFE

The appellant argues he had standing to object to the legality of the search and seizure of his knife and it was prejudicial error for the trial court to allow the knife into evidence. The question of standing involves an inquiry into whether the person challenging a search had a legitimate expectation of privacy in the area searched. *State v. Fillyaw*, 104 Wis. 2d 700, 312 N.W.2d 795 (1981), *cert. denied*, 455 U.S. 1026 (1982). The burden is on the defendant to prove his legitimate expectation of privacy. *State v. Callaway*, 106 Wis. 2d 503, 520, 317 N.W.2d 428, 437 (1982).

At the suppression hearing the trial court found that Garcia and a non-defendant appeared on an apartment directory as occupants of the apartment, there were two beds in the apartment, and Garcia gave permission for the police officers to enter. At the postconviction motion hearing, the trial court stated:

Well, I guess I do think we've gone over the business of admissibility of the knife during the course of the early phases of the charge prior to trial and I guess I would have to stand pretty much on that record. There was not much effort to show standing within the framework of the cases that you cited.

No additional findings were made based on the evidence presented at trial. The parties do not dispute that the appellant was an overnight guest in the apartment the night before the search, had moved from room to room during the assaults and owned or at least had possession of the knife. We adopt the findings of the trial court, while adding the undisputed facts set forth above.

We need not defer to the trial court's legal conclusion that appellant had not proven standing. *Fillyaw,* 104 Wis. 2d at 711, 312 N.W.2d at 801. *Fillyaw* lists several factors relevant to determining whether one has a legitimate expectation of privacy:

(1) Whether one has a property interest in the premises;
(2) Whether one is legitimately (lawfully) on the premises;
(3) Whether one had complete dominion and control and the right to exclude others;
(4) Whether the person took precautions customarily taken by those seeking privacy;
(5) Whether the property was put to some private use;
(6) Whether the claim of privacy is consistent with historical notions of privacy.

*Id.* at 711 n. 6, 312 N.W.2d at 801.

While the appellant has not proven a property interest, he was legitimately on the premises as an overnight guest and appeared to have access to all areas of the apartment. *Rakas v. Illinois,* 439 U.S. 128, 142 (1978), establishes that a person may have a legally sufficient interest in a place other than his home. Overnight guests have a legitimate expectation of privacy in the homes of their their hosts. *See, e.g., United States v. Haydel,* 649 F.2d 1152 (5th Cir.), *modified,* 664 F.2d 84 (5th Cir. 1981), *cert. denied,* 455 U.S. 1022 (1982); *United States v. Robertson,* 606 F.2d 853, 858 n. 2 (9th Cir. 1979); *United States v. Karo,* 710 F.2d 1433, 1441 (10th Cir. 1983) *cert. granted,* —— U.S. ——, 104 S.Ct. 972 (1984); *United States v. Cassity,* 720 F.2d 451, 457–58 (6th Cir. 1983). This is an expectation which is consistent with historical notions of privacy.

In addition, the seized item was in appellant's possession at least part of the night. While possession alone will not confer standing, it is a relevant consideration.

*United States v. Salvucci*, 448 U.S. 83, 91 (1980). It was put to his private, albeit illegal, use.

We conclude that appellant had a legitimate expectation of privacy in the apartment when it was searched. We reject the respondent's contention that this expectation did not extend to the area under the bed since the record indicates the appellant had unrestricted access to the bedroom and the bed during the assaults.

The trial court ruled that even if it erred on the question of standing, the error was harmless as there was substantial testimony at trial about the knife and no denial of it.

Even if appellant had standing to challenge the search, and the search was illegal, we need not reverse if failure to suppress the knife was harmless error. Errors of constitutional dimension may be harmless. *State v. Zellmer*, 100 Wis. 2d 136, 150, 301 N.W.2d 209, 216 (1981).

> The standard for determining whether constitutional error is harmless . . . requires the beneficiary of the constitutional error, here the state, "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained . . . and the court must be able to declare a belief that [the constitutional error] was harmless beyond a reasonable doubt." The court determines whether the error is harmless by assessing the probable impact of the erroneously admitted evidence on the minds of an average jury, that is, by assessing whether there is "a reasonable possibility that the evidence complained of might have contributed to the conviction."

*State v. Billings*, 110 Wis. 2d 661, 666–67, 329 N.W.2d 192, 194–95 (1983) (citations omitted).

Some of the factors used to assess prejudicial effect of an error include: (1) the frequency of the error; (2) the nature of the state's case; and (3) the defense pre-

sented at trial. The court may also consider whether the evidence is duplicative, i.e., whether the evidence discloses the same facts as the untainted evidence and both have the same probative value and effect. *Id.* at 669, 329 N.W.2d at 195–96. We must examine both the erroneously admitted evidence and the untainted evidence in context, not in isolation. *Id.* at 673, 329 N.W.2d at 197.

The record indicates that the knife was identified at trial by both R.L. and S.P., after each girl had testified that she saw a knife. Presumably this was error. The knife was highly relevant to the state's case to show force or threat of force and lack of consent. However, the state also relied on the bicycle chain, dragging S.P. into the bathroom and the detention of the girls to establish these factors. The defense focused on consent and aiding and abetting. The defense did not attempt to dispute that S.P. was at the apartment, that there had been several acts of intercourse, or that a knife was present. S.P.'s credibility was questioned in relation to consent, rather than whether there was a knife. S.P.'s and R.L.'s descriptions of the knife were uncontroverted. This portion of their story was further corroborated by Officer Klubertanz and Sergeant Little's testimony that S.P. reported use of a knife shortly after the alleged assault. We conclude beyond a reasonable doubt that introduction of the actual knife was merely cumulative and did not contribute to verdicts which would not otherwise have been reached. Any error committed was harmless.

## II.  THE OUT OF COURT STATEMENT

The second ground for reversal involves the admission of Garcia's translation of Sosa's statement, spoken in Spanish, that Sosa would go out to get soda after the girls

stated they wanted to leave the apartment for that purpose. The trial court allowed the testimony contingent upon a showing of conspiracy and in the alternative, based on the state's representation that the statement was not being offered for the truth of the matter asserted. After trial, the court held that a conspiracy had been established. The appellant argues that this statement was hearsay, that it was admitted in violation of the appellant's right of confrontation, that it does not fall under the conspiracy exception to the hearsay rule, and that its prejudicial effect outweighs its probative value. The question on appeal is whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record in admitting the evidence. *State v. Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225, 228 (1979).

"Hearsay" is defined as: "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Section 908.01(3), Stats. "The hearsay rule does not prevent a witness from testifying as to what he heard; it is rather a restriction on the proof of fact through extrajudicial statements." *Dutton v. Evans*, 400 U.S. 74, 88 (1970).

Garcia's statement of what Sosa said was not offered to prove that Sosa would get soda or that the young women would be prevented from leaving. The statement was offered to establish that it was said, that the girls heard it and that they were intimidated. The statement was therefore not hearsay and its admission was not an abuse of discretion.

Further, the statement was admissible as a statement of a co-conspirator. Under sec. 908.01(4)(b)5., Stats., a statement is not hearsay if it is a statement of a co-conspirator made during the course and in furtherance of the

conspiracy. In order for such statements to be admissible, there must be a prima facie showing that a conspiracy exists between the declarant and a party to the suit. The conspiracy upon which admissibility depends must be proven independently of the hearsay so that the hearsay does not lift itself by its own bootstraps to the level of competent evidence. *State v. Dorcey*, 103 Wis. 2d 152, 157–58, 307 N.W.2d 612, 615 (1981). In addition, since the rule is limited to statements made during the course and in furtherance of the conspiracy, we must determine when the conspiracy began and ended.

Under *Dorcey*, a court may hear the disputed testimony first, contingent upon a later showing of conspiracy. This is how the trial court proceeded. At the hearing on the postconviction motion, the trial court found that a conspiracy existed when the statement was made, stating: "I think that the whole tenor of that evening was that there was a conspiracy going on." We take this comment to mean that the trial court believed a conspiracy had commenced when the girls arrived, or soon after. This is a finding of fact which will be upheld on appeal unless contrary to the great weight and clear preponderance of the evidence. *Id.* at 159–60, 307 N.W.2d at 616.

A conspiracy commences when: (1) an agreement is made between two or more people to direct their conduct toward the realization of a criminal objective; (2) each co-conspirator intends the realization of that objective; and (3) each co-conspirator has an individual stake in the conspiracy. *Cranmore v. State*, 85 Wis. 2d 722, 752, 271 N.W.2d 402, 418 (1978).

The evidence shows that while Garcia told R.L. only one other person would be at the apartment, three males were present when they arrived. Upon entering the apartment, Garcia stated, "We have some ladies here."

The men gathered around the girls and spoke to each other in Spanish, which R.L. and S.P. did not understand. Corborberde made sexual advances towards S.P. and Garcia told S.P. Corborberde said he liked her. When the young women asked if they could leave to get a soda, according to R.L., Sosa slammed a bicycle chain against a chair, hit her on her shoulder and indicated she should be quiet. This is when the alleged hearsay statement was made. This evidence is sufficient to establish a prima facie showing that a conspiracy had commenced by this time, especially in light of the subsequent events. The trial court's finding is not against the great weight and clear preponderance of the evidence.

In any event, the evidence established that either Sosa or Garcia got soda, and that the young women were held in the apartment when they attempted to leave. Therefore, even if the statement had been offered to prove the truth of the matter asserted and was not admissible under the co-conspirator exception, it was only cumulative to uncontested facts and its admission was harmless. *Caccitolo v. State,* 69 Wis. 2d 102, 108, 230 N.W.2d 139, 142 (1975).

Appellant argues that admission of the statement violated his right of confrontation, contrary to the U.S. Const., amend. VI, which provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

The right to cross-examine witnesses is a fundamental right, implicit in the constitutional right of confrontation. *Cranmore,* 85 Wis. 2d at 758, 271 N.W.2d at 420. The appellant argues that when Garcia's statement was offered as evidence, Garcia became a witness against him. His confrontation rights were violated because he was denied the opportunity to cross-examine Garcia.

A confrontation clause problem does not arise when testimony is offered merely to prove that a statement was made. A witness under oath, subject to cross-examination, and whose demeanor can be observed by the jury, is a reliable informant as to what she heard. *Dutton,* 400 U.S. at 88.

If the statement would be inadmissible hearsay but for the conspiracy exception, confrontation rules apply. Admissibility under hearsay rules does not guarantee admissibility under the confrontation clause. To meet the test of admissibility under the confrontation clauses, "the declarant must be unavailable as a witness and the statement must bear sufficient indicia of reliability." *State v. Marshall,* 113 Wis. 2d 643, 652–53, 335 N.W.2d 612, 616 (1983).

Reliability can be inferred without more if the evidence falls within a firmly rooted hearsay exception. *Ohio v. Roberts,* 448 U.S. 56, 66 (1980). While the inference of reliability is strong, the court must still examine each case to determine whether there are unusual circumstances which warrant exclusion of the evidence. If unusual circumstances exist, the evidence is admissible if the trier of fact has a reasonable basis for evaluating the truthfulness of the prior statement. *State v. Bauer,* 109 Wis. 2d 204, 213–14, 325 N.W.2d 857, 862 (1982).

The appellant argues the statement was particularly unreliable because it was a translation. The record discloses that Garcia conversed freely in both English and Spanish on the night of the alleged assault. R.L. described Garcia's English as "excellent." S.P. understood Sosa to say "no" when she and R.L. announced they were leaving to get soda. There can be no doubt the girls were

dissuaded and that one of the men subsequently did go out to purchase soda. Finally, the young women were detained when they later announced they were leaving. We conclude that the statement was reliable. It was admissible under the conspiracy exception to the hearsay rule, which is well-rooted in Wisconsin law. *Dorcey* 103 Wis. 2d at 162, 307 N.W.2d at 617. Further, the appellant has conceded Garcia's unavailability and has not raised the issue of Sosa's availability. Finally, it is unlikely that Garcia's translation was inaccurate, as shown by subsequent events. We hold appellant's confrontation rights were not violated.

Appellant contends that the statement should have been excluded since its probative value is outweighed by the danger of unfair prejudice. Sec. 904.03, Stats.

This particular objection was never raised before the trial court. Nevertheless, we believe the evidence should not have been excluded under sec. 904.03, Stats.

Evidence is unfairly prejudicial if it has "a tendency to influence the outcome by improper means," or if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish," or otherwise causes a jury "to base its decision on something other than the established propositions in the case."

*Lease America Corp. v. Ins. Co. of N. America,* 88 Wis. 2d 395, 401, 276 N.W.2d 767, 770 (1979) (citation omitted). The statement was relevant to the issues of consent and aiding and abetting. It did not have a tendency to influence the outcome by improper means, nor did it cause the jury to base its decision on anything other than the issues in the case. Rather, it was one of many pieces of evidence introduced to establish the elements of the crime. Its probative value was not outweighed by its prejudicial effect.

## III.  JURY INSTRUCTION

The appellant contends that the jury instruction for first degree sexual assault aiding and abetting was improper. He argues that absent his aiding and abetting, the other men would have committed second degree sexual assault, so he actually aided and abetted second degree assaults.

The issue of whether to instruct the jury on a different degree of the offense charged is one of law. *State v. Williford,* 103 Wis. 2d 98, 112, 307 N.W.2d 277, 283 (1981). The trial court held the first degree instruction was proper, reasoning it was not necessarily the appellant's act of aiding and abetting which raised the other assaults to first degree. Rather, the appellant aided and abetted six assaults which had already become first degree by virtue of the aiding and abetting of two other males. Even though we are not required to defer to the trial court on questions of law, we agree with this conclusion.

We also have no difficulty holding it is permissible for appellant's aiding and abetting to supply a necessary element of the first degree offense. *See, e.g., Hawpetoss v. State,* 52 Wis. 2d 71, 77–78, 187 N.W.2d 823, 826 (1971), *Mentek v. State,* 71 Wis. 2d 799, 805, 238 N.W. 2d 752, 756 (1976).

We reject the appellant's argument that the legislature intended to punish the aider and abettor in a sexual assault less harshly than the perpetrator. Where one aids another in the execution of a crime, he is liable for that substantive crime. *Mentek,* 71 Wis. 2d at 805, 238 N.W.2d at 756. The party to a crime statute applies unless a legislative intention to the contrary is either

explicit or implicit in the statute. *State v. Tronca,* 84 Wis. 2d 68, 84, 267 N.W.2d 216, 223 (1978). Sec. 939.05, Stats., is inapplicable where a penal statute specifically provides for vicarious liability, which sec. 940.225, Stats., does not provide. Nothing else in sec. 940.225 compels a conclusion that sec. 939.05 should apply other than as the trial court instructed. We hold it was proper to give the first degree sexual assault aiding and abetting instruction.

## IV. EXCESSIVENESS OF SENTENCE

Appellant's final issue is whether the sentence was unduly harsh, excessive and unconscionable. The relevant factors to be considered in sentencing are: protection of the public, gravity of the offense and the rehabilitative needs of the defendant. *McCleary v. State,* 49 Wis. 2d 263, 276, 182 N.W.2d 512, 519 (1971). The trial court may also consider the defendant's criminal record; history of undesirable behavior patterns; personality, character and social traits; results of a presentence investigation; vicious or aggravated nature of the crime; degree of culpability; demeanor at trial; age, educational background and employment record; remorse, repentance and cooperativeness; need for close rehabilitative control; and rights of the public. *State v. Macemon,* 113 Wis. 2d 662, 667–68, 335 N.W.2d 402, 405–06 (1983).

A trial court may review its sentence for abuse of discretion based on its conclusion that the sentence was unduly harsh or unconscionable. *State v. Wuensch,* 69 Wis. 2d 467, 480, 230 N.W.2d 665, 672 (1975). Our standard of review is whether the trial court abused its discretion. *Macemon,* 113 Wis. 2d at 670, 335 N.W.2d at 407. There is a strong policy against interfering with

the trial court's sentencing discretion. *State v. Tuttle*, 21 Wis. 2d 147, 150, 124 N.W.2d 9, 11 (1963). Abuse of discretion might be found if the trial court failed to state on the record material factors which influenced its decision, gave too much weight to one factor in the face of other contravening considerations, or relied on irrelevant or immaterial factors. *Harris v. State*, 75 Wis. 2d 513, 518, 250 N.W.2d 7, 10 (1977). The weight to be given to each of the relevant factors is particularly within the wide discretion of the trial court. *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457, 461 (1975). Imposition of a sentence may be based on any of the three primary factors after all relevant factors have been considered. *Anderson v. State*, 76 Wis. 2d 361, 366–67, 251 N.W.2d 768, 771 (1977).

The appellant argues that the crime was not as serious as it appears, his character was not seriously considered, there is no indication he constitutes a danger to the public, the sentence was influenced by the atmosphere in which it took place and it is disproportionate to other sentences in similar cases.

Whether or not this court may have imposed a different sentence in this case, the question on appeal is did the trial court abuse its discretion. The trial court noted the following factors at the sentencing hearing: the offense and situation were brutal; the appellant showed great disrespect toward the victim; there had been no acknowledgment of wrongdoing at or after trial;[1] after

---

[1] At his sentencing hearing, in response to the court's inquiry as to whether he had anything to say with regard to imposition of sentence, the appellant made a statement in Spanish, which was translated by an interpreter as follows:

All I have to say is that I'm innocent. You have to do what you have to do and please finish with me because I don't want to see you anymore. The murderer here isn't me. It's you and the prosecutor. You're going to be taking my life for a crime that I haven't committed. And that's all.

the victim arrived at the apartment, the events were thought out and the acts committed with intent; the fact that the appellant is educated means he should be more aware of his actions; appellant was the first person to assault the victim, did so by threat of a knife, and threatened her again with a knife before she left; the appellant had maintained a substantially crime-free life as an adult; the victim was young; extreme depravity was exhibited towards the victim; and the substantial effect which the events have had upon the victim.

The trial court stated the reasons for its sentence on the record and there is no indication that it considered irrelevant or immaterial factors. There is a presumption that a trial court acts reasonably in sentencing and the appellant must show some unreasonable or unjustifiable basis in the record for the sentence complained of. *Brozovich v. State,* 69 Wis. 2d 653, 655, 230 N.W.2d 639, 641 (1975). We cannot presume that the trial court took improper factors into consideration when the record indicates otherwise. *Id.* at 661, 230 N.W.2d at 644.

We disagree that the trial court considered the crime more serious than the facts warranted. The fact that the victim did not suffer any physical trauma other than the vaginal injury does not mean that the assault was not serious. The victim could have avoided additional physical injury by not resisting any more than she did. We are unable to gauge the psychological trauma she has suffered, although the presentence report indicated that the effect on the victim had been substantial.

The appellant claims that there were more offensive cases in which lighter sentences were imposed. However, the court has held repeatedly that mere disparity in sentences received by persons committing similar crimes does not establish denial of equal protection. *Macemon,* 113 Wis. 2d at 669, 335 N.W.2d at 406, and cases cited therein.

The legislature intended that individual criminals, though guilty of the same statutory offense, were not necessarily to be treated the same but were to be sentenced according to the needs of the particular case as determined by the criminals' degree of culpability and upon the mode of rehabilitation that appears to be of greatest efficacy.

*McCleary*, 49 Wis. 2d at 275, 182 N.W.2d at 518.

The circumstances of the cases cited were different from the present case. Further, we know nothing of the rehabilitative needs or histories of those defendants. In short, we cannot make any meaningful comparisons on the basis of the facts provided. A more appropriate comparison would be to the sentence received by one of the co-defendants in this case, Sosa, who was given the same sentence. The trial court indicated that it took Sosa and the appellant's relative degrees of culpability into account in sentencing the appellant. No abuse of discretion was committed.

Regarding the consecutive sentences, *Cunningham v. State*, 76 Wis. 2d 277, 284–85, 251 N.W.2d 65, 69 (1977), held that a trial judge has discretion to determine whether sentences imposed in cases of multiple convictions are to run concurrently or consecutively, using the same factors that apply in determining the length of a single sentence.

While we agree that the sentence imposed was indeed substantial, under the law of this state as it now stands, including the scope of this court's review, for the reasons set forth above we conclude that the trial court did not abuse its discretion in sentencing the defendant. If different factors are to be considered by the trial court and if a different standard of appellate review is to be applied, those decisions must rest with the legislature or the state's highest appellate court.

*By the Court.*—Judgment and order affirmed.

GARTZKE, P.J. (concurring). I agree that when sentencing defendant the trial court did not misuse its

discretion under this state's current case law. In my view, however, the supreme court should reconsider the factors the trial court must take into account when imposing consecutive sentences.

As the lead opinion emphasizes, the trial court has discretion to determine whether sentences for multiple convictions should run concurrently or consecutively, using the same factors that apply in determining the length of a single sentence. *Cunningham v. State,* 76 Wis. 2d 277, 284–85, 251 N.W.2d 65, 69 (1977). Special circumstances nevertheless exist when deciding whether sentences for multiple convictions should run concurrently or consecutively.

One circumstance is longevity. Having been found guilty of three counts of first-degree sexual assault, six counts of first-degree sexual assault as an aider and abettor and one count of abduction, defendant faced a possible total of 190 years in prison, if all sentences were served consecutively. The total is meaningless. It can never be served. The trial court recognized this to some extent when rejecting the prosecution's recommendation of a one hundred year sentence. Because, however, defendant was twenty-five when sentenced, eighty years is as meaningless as one hundred years.

Another special circumstance is that multiple crimes may be closely related and occur in a short time span, as here. The trial court recognized this factor, again to some extent. It made the ten-year abduction sentence run concurrently with the other sentences because the abduction was "part and parcel," as the court put it, of the assaults. A similar thought may underlie the court's decision to make concurrent the twenty-year terms on the six assaults which defendant aided and abetted. The distinctly personal nature of the three other assaults apparently caused the court to run those sentences consecutively, without considering the short period between assaults.

A sensible approach, in my view, is that set forth in 3 *ABA Standards for Criminal Justice* Standard 18–4.5 (2d

ed. 1980) on sentences for multiple crimes. ABA Standard 18–4.5(a) is consistent with Wisconsin law in that whether sentences shall run consecutively or concurrently is left to the discretion of the trial court. ABA Standard 18–4.5(b) proposes that authority to impose a consecutive sentence should be circumscribed by various limitations, including the following: "The court should be authorized to impose such a [consecutive] sentence only after a finding that confinement for such a term is necessary in order to protect the public from further serious criminal conduct by the defendant . . . ." ABA Standard 18–4.5(b)(iv). The quoted requirement automatically takes longevity into account and recognizes that the future danger to the public may be less when multiple crimes are committed in a short period at one location rather than spread in time and location.

The *Cunningham* court, relying on prior decisions, expressly declined to follow ABA Standard 18–4.5(b). 76 Wis. 2d at 284, 251 N.W.2d at 68. Consequently, the trial court cannot be faulted for its failure to decide if an eighty-year sentence imposed on a twenty-five year old male is necessary to protect the public from sexual assaults of the kind he committed and assisted. Had the trial court applied ABA Standard 18–4.5(b), as defendant's counsel requested, perhaps it would not have imposed an eighty-year sentence. A forty-year sexual assault sentence for a twenty-five year old man probably would satisfy the ABA standard.

I am authorized to state that JUDGE MARTHA J. BABLITCH joins in this concurrence.

BABLITCH, J. (concurring). I agree with Judge Gartzke's analysis. I write separately because I think it needs to be stated that under present law, this court is powerless to remedy a sentence which shocks its conscience unless the trial court seriously falters in employing the familiar checklist of discretionary factors

relevant to its decision. So long as the trial court discusses each such factor, this court is a rubber stamp for any sentence which may be imposed. This is so despite any sense of injustice, however deep and lingering, which may form during a review of the record.

The defendant in this case, a recent immigrant from Cuba, has no prior criminal record. He did not set forth to seek sexual adventure on the night in question. He said he believed the girls (or "women," as he called them) were "available" when they came to the apartment about midnight, looking for a dollar and some marijuana, and stayed to talk and smoke marijuana with a group of men they did not know, whose language they did not share. Perhaps, in his culture, such conduct at such an hour would be widely interpreted as an invitation to sexual games by willing players familiar with the possible consequences. Perhaps he proceeded on that assumption, however loathsome such an assumption is rightly regarded as being in this culture, in this day.

I do not suggest that cultural factors or a "macho" world-view excuse these crimes. They do not. But eighty years of a person's life is a high price to exact for acts which may have been set in motion by misjudgment about the mores of a new culture, and misreading the signals of its women. That those signals may be sometimes both confusing and confused is in this case exemplified by the fact that S.P. stayed to eat a plate of ham and crackers with the men after the assaults were over, kissed one of her attackers goodbye, and promised to return later to take the men to a party. She then admittedly, repeatedly lied to the police by claiming she had been abducted at knifepoint by five men in a car, and taken to the apartment by force. She did not correct that story until five days after the arrests, when she said she had fabricated it to avoid her father's anger and to protect her girlfriend, who was a runaway minor.

S.P.'s conduct, including her minimal resistance to the assaults, is understandable if she was in fear for her life, as she testified. The defendant's lack of remorse may begin to be understandable if he believed that S.P.'s conduct was an accurate reflection of her attitude, and that she had falsely accused him of violent abduction. This consideration does not justify or excuse his acts. It is relevant, however, to passing sentence upon them.

The defendant must be punished for his part in forcing, degrading and traumatizing S.P. The punishment should be sufficient to deter him, and others, from committing such acts in the future. But the punishment should be a just one, and proportionate to its circumstances.

The presentence investigation report recommended twenty to twenty-five years. The trial court imposed a sentence more than three times greater. What is a "just" and "proportionate" sentence under the circumstances of this case? What is this court's proper role in considering that question? The ABA standard, or other standards articulated by the supreme court, would provide this court with needed guidance in circumstances such as these.