STATE of Wisconsin, Plaintiff-Respondent,

v.

Richard G. HAMM, Jr., Defendant-Appellant.†

Court of Appeals

*No. 87–1699–CR. Submitted on briefs March 23, 1988.—*
*Decided July 28, 1988.*

(Also reported in 430 N.W.2d 584.)

† Petition to review denied.

For the defendant-appellant the cause was submitted on the briefs of *Jack E. Schairer,* assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *Donald J. Hanaway,* attorney general, and *David J. Becker,* assistant attorney general.

Before Gartzke, P.J., Dykman and Sundby, JJ.

GARTZKE, P.J. Richard Hamm appeals from a judgment of conviction on eleven felony counts, in-

cluding sexual assaults, attempted sexual assaults, and burglaries contrary to secs. 940.225(1)(b) and 943.10(2)(b), Stats., and from an order denying his motion for a new trial. The several issues he raises are whether (1) the counts regarding 1983 incidents should have been separately tried from those arising out of a 1985 incident; (2) the trial court abused its discretion by refusing to admit expert testimony on eyewitness identification; (3) the court should have excluded certain evidence; (4) Hamm's trial counsel was ineffective; and (5) the court abused its discretion by imposing sentences totaling 105 years. Finding no prejudicial error, we affirm.

### A.

### *BACKGROUND*

On September 5, 1983 two girls, 12 and 13 years old, were sexually assaulted in a Madison apartment. Before sunrise, the 12-year-old, C.C. awoke with a man kneeling at her bed. She described him as a white male, about 5′6″ tall, 150 lbs., short light brown hair with traces of a mustache and whiskers, and wearing a brown plaid long-sleeved shirt and faded blue jeans. At Hamm's trial she said the man wore a blue baseball cap and a "mostly white" towel over part of his face and tennis shoes and carried a knife. C.C. said she saw part of his face "for a couple seconds" when the towel fell down. By this time the sun was up; she could have read a newspaper. She identified Hamm in the courtroom as her attacker. The other girl, J.C., described him as a white male about 5′5″, medium build and light brown straight hair. He wore a Burke Bar baseball cap and a towel over his face and had a knife. The towel was white with flowers on it. It was

from the apartment. He wore a brown long-sleeved shirt. The knife had a serrated blade. He touched the sexual parts of both girls and made them touch his. When there was a noise upstairs, he ran out.

About 2:00 a.m. on December 13, 1983, P.O. awoke in her apartment, located in the same apartment complex (but on a different block) where the assaults just described had occurred. P.O. went to her living room and saw a man crouched near the kitchen. He wore a white long-sleeved shirt and brown pants, had dark curly or wavy hair, bushy eyebrows and high cheek bones, and was between 5'10" and 6' tall. He had a towel over his face and a knife in his hand. The towel and knife were from her apartment. He pushed her into the bedroom, they struggled, he pulled away and left, having said nothing. She could tell he was white but never saw his whole face. Entry had been made through a sliding glass window. Hamm's left thumb print was found on the window.

In the early morning hours of March 2, 1985, in an apartment in the same building and next to P.O.'s apartment, B.C. saw a man at the foot of her bed. It was too dark to read. He had a medium build, wore a light-colored towel on his face and was armed with a knife. He tried to have intercourse with her and then ran out of the apartment. The police were called. Within a minute and a half after receiving the dispatch, an officer in the next block on the same road saw a car accelerating out of a parking lot, and immediately checked the registration. The car was registered to Hamm's wife. The police went to Hamms apartment and arrested him. Hamm's wife testified that about 3:30 a.m. that day she had called the police because her husband was not home.

B.C. testified that during the assault she resisted by reaching up and grabbing the knife the man was holding in his left hand. It was her knife and had been in her kitchen. When Hamm was arrested about an hour after the assault, he had a small cut or wound on his left hand. The police found a yellow "Cannon" towel in a dumpster about 70 feet from where Hamm had parked his wife's car outside their apartment. The towel was the only loose item in the dumpster, everything else having been packaged in garbage bags. The towel matched a "Cannon" towel which was missing from B.C.'s apartment after she was assaulted.

On March 7, 1985, the police conducted a lineup. P.O. identified a person other than Hamm as her assailant. B.C. was unable to identify anyone. C.C. identified Hamm, partly on the basis of his voice.

Hamm denied committing the 1983 assaults. He testified that the night of March 1, 1985 he drank at various bars until he was drunk, then drove his wife's car around and finally stopped to sleep, then awoke, went home, again fell asleep and awoke when the police arrived.

## B.

### JOINDER OF 1985 CHARGES WITH 1983 CHARGES

Hamm contends that the trial court erred by joining for trial the charges based on the 1985 incident with those based on the 1983 incidents. Section 971.12(1), Stats., provides in relevant part,

Two or more crimes may be charged in the same complaint ... in a separate count for each crime if

137

the crimes charged ... are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan.

To be of the "same or similar character" under sec. 971.12(1), Stats., crimes must be the same type of offenses occurring over a relatively short period of time and the evidence as to each must overlap. *State v. Hoffman,* 106 Wis. 2d 185, 208, 316 N.W.2d 143, 156 (Ct. App. 1982). It is not sufficient that the offenses involve merely the same type of criminal charge. *Id.* Whether charges are properly joined in a criminal complaint is a question of law. *Id.*

The crimes charged relating to the 1985 and 1983 incidents were the same type of offenses, since each incident gave rise to armed burglary and first-degree sexual assault charges.

The evidence overlaps. The similarities between the acts in each incident tended to establish the identity of the criminal. In each incident, the perpetrator entered a home in the small hours of the morning armed with a knife, disguised, and committed a sexual assault. Each occurred in apartments on the same street within a few hundred feet of each other, two of the three assaults occurring in adjoining apartments, and in each case entry and exit were through windows facing the same wooded area. In each case the perpetrator entered unarmed but armed himself with a knife taken from the premises, concealed his face with a towel taken from the premises, and entered to commit a sexual assault.

In *Francis v. State,* 86 Wis. 2d 554, 560–61, 273 N.W.2d 310, 313–14 (1979), our supreme court conclud-

ed that where crimes charged involved two or more incidents which exhibited the same modus operandi, were close in time, and occurred within the same geographic area, the acts were connected or constituted parts of a common scheme or plan which tended to establish the identity of the perpetrator. The court held that the evidence of each crime would be admissible in separate trials for each, and joinder was proper under sec. 971.12(1), Stats.

In *Francis,* however, the two incidents on which charges were based were thirty-five days apart. 86 Wis. 2d at 561, 273 N.W.2d at 313. Here fifteen to eighteen months lapsed between the 1983 and 1985 incidents, and the question is whether that is a "relatively short period of time."

When we said in *Hoffman,* 106 Wis. 2d at 208, 316 N.W.2d at 156, that for joinder purposes crimes are of the same or similar character if they are the same type of offenses occurring over a relatively short period of time and the evidence as to each count overlaps, we quoted from *United States v. Shearer,* 606 F.2d 819 (8th Cir. 1979). We relied on *Shearer* because of the similarities between the federal and Wisconsin rules governing joinder and severance. Federal cases therefore provide some guidance to the resolution of joinder and severance issues. *Hoffman* at 208 n.8, 316 N.W.2d at 156. The *Shearer* court held that a two-week period between joined offenses did not violate the "relatively short period of time" factor. 606 F.2d at 820.

The Eighth Circuit has refined the "relatively short period of time" requirement it applied in *Shearer.* In *United States v. Rodgers,* 732 F.2d 625, 629 (8th Cir. 1984), the court said that the time-period factor

> is to be determined on a case-by-case approach; there is no per se rule on when the time period between similar offenses is so great that they may not be joined. Indeed, that is why we have referred to a '*relatively* short period of time' between the two offenses. The time period is relative to the similarity of the offenses, and the possible overlapping of evidence. [Emphasis in original.]

The *Rodgers* court held that a twenty-month period between offenses did not violate the "relatively short period of time" factor, when the offenses were of the same type, the evidence would overlap somewhat, and "relative to these factors," the time period was sufficiently short. *Id.* at 629–30.

■

Here the basic facts in the 1983 and 1985 incidents are greatly similar and the overlap is substantial. We conclude that the "relatively short period of time" requirement has been satisfied.

We reject the contention that joinder was improper because it precluded Hamm's invocation of a fifth amendment privilege as to the 1983 incidents but not as to the 1985 incident. Hamm's sole authority to support his preclusion contention is *State v. Hall,* 103 Wis. 2d 125, 307 N.W.2d 289 (1981), but that decision does not assist him. The *Hall* court refused to adopt a rule that severance is mandatory when a defendant decides to selectively testify on some but not all of properly joined charges. *Id.* at 148, 307 N.W.2d at 300. The *Hall* court noted that were it to adopt such a rule, control of joinder or severance would pass from the trial court to defendants. *Id.*

We hold that 1983 and 1985 incidents were properly joined under sec. 971.12(1), Stats.

## C.

## *EXPERT EVIDENCE REGARDING EYE WITNESS IDENTIFICATION*

1. *Discretion to Admit or Exclude Expert Testimony on Eyewitness Identification*

On the first day of trial, Hamm's counsel stated he would call a named expert in eyewitness identification. Subsequently the state moved *in limine* to exclude the expert's testimony. The basis for the motion was that the prosecution "anticipate[d]" that the expert's testimony would not assist the jurors and that effective cross-examination and the jurors' common sense would be sufficient. The prosecutor did not, however, know what the testimony would be.

The expert did not testify at the motion hearing, and Hamm's counsel could not make a complete offer of proof regarding the expert's testimony. (The state does not argue on appeal that the offer of proof was inadequate.) Counsel could only advise the court that the expert had referred him to *Hampton v. State,* 92 Wis. 2d 450, 285 N.W.2d 868 (1979),[1] and to an Arizona case, and that the expert's role would be to enable the jurors to better evaluate and understand the evidence regarding identification and to advise them of the variables they should take into account.

The trial court said that it saw eyewitness identification testimony as an experimental area and an inexact science. It said that jurors came to the court

---

[1]Hamm's reference to a "Hampton-type" instruction is presumably to "Model Special Instructions on Identification" set forth in *United States v. Telfaire,* 469 F.2d 552, 558–59 (D.C. Cir. 1972), the use of which (with adaptation to the particular facts) was urged in the concurring opinion of Justice Abrahamson in *Hampton,* 92 Wis. 2d at 465, 285 N.W.2d at 875.

with common sense, and concluded that nothing the expert could offer to the jurors would be helpful in making their decision. The court considered it inappropriate to permit the expert to testify as a "superjuror" and granted the state's motion to exclude.

Hamm contends that expert testimony on eyewitness identification is admissible under *Hampton*. That contention has too broad a sweep. The *Hampton* court held only that a trial court did not abuse its discretion when it ruled that a defendant's expert on eyewitness identification would be permitted to list the factors affecting human perception. 92 Wis. 2d at 458, 285 N.W.2d at 872. *Hampton* does not hold that expert testimony on eyewitness identification is admissible per se. Admission or exclusion is left to the trial court's discretion.

Nor do we agree that expert testimony on eyewitness identification is admissible per se. Such a ruling would be contrary to Wisconsin case law. In this state, the general rule is that whether to allow scientific evidence through the testimony of an expert is left to the trial court's discretion. If the court determines that the evidence is relevant, then the "fundamental determination of admissibility comes at the time the witness is 'qualified' as an expert." *State v. Walstad* 119 Wis. 2d, 483, 518–19, 351 N.W.2d 469, 487 (1984). The relevancy of an expert's testimony depends upon whether it would assist the factfinder when considering the issues. *State v. Friedrich*, 135 Wis. 2d 1, 15, 398 N.W.2d 763, 769 (1987). The court's determination that evidence is or is not relevant is discretionary. *State v. Pharr*, 115 Wis. 2d 334, 344–45, 340 N.W.2d 498, 502–03 (1983). So is a trial court's determination that a proposed witness is not qualified

to testify as an expert. *Simpsen v. Madison General Hospital,* 48 Wis. 2d 498, 509, 180 N.W.2d 586, 592 (1970). Weighing the probative value of the evidence to determine whether that value is exceeded by unfair prejudice or other considerations is also a discretionary function of the trial court. *State v. Wollman,* 86 Wis. 2d 459, 464, 273 N.W.2d 225, 228 (1979). Consequently, whether or not an expert's opinion should be admitted is within the trial court's discretion.

After relevancy and the expert's qualifications have been established, the reliability of the expert's opinion is a credibility issue to be resolved by the factfinder. *State v. Shaw,* 124 Wis. 2d 363, 367, 369 N.W.2d 772, 774 (Ct. App. 1985).

Several cases have applied the general rule. *See Friedrich,* 135 Wis. 2d at 16–17, 398 N.W.2d at 770 (exclusion of psychological profile evidence for sexual offender not abuse of discretion); *State v. Stinson,* 134 Wis. 2d 224, 235, 397 N.W.2d 136, 140 (Ct. App. 1986) (admission of bite mark identification evidence not abuse of discretion); *Shaw,* 124 Wis. 2d at 364–65, 369 N.W.2d at 772–73 (admission of fingernail comparison evidence not abuse of discretion); *State v. Johnson,* 118 Wis. 2d 472, 475–76, 348 N.W.2d 196, 198 (Ct. App. 1984) (exclusion of expert testimony on eyewitness identification reliability sustained where evaluative factors to which expert would testify were irrelevant to evidence jury had heard.)

Only once has the supreme court departed from the general rule. In *State v. Dean,* 103 Wis. 2d 228, 307 N.W.2d 628 (1981), while refusing to hold whether polygraph test results are acceptable scientific evidence or cannot be admitted under any circumstances, the court concluded the reliability of a polygraph is

not such "as to permit unconditional admission of the evidence." *Id.* at 278–79, 307 N.W.2d at 653. The *Dean* court withdrew polygraph evidence from the discretionary realm by holding that such evidence is no longer admissible in a criminal proceeding. *State v. Ramey,* 121 Wis. 2d 177, 179, 359 N.W.2d 402, 404 (Ct. App. 1984).

It is true that, as Hamm argues and the state concedes, the *Hampton* court did not expressly rule that a trial court may in its discretion *exclude* testimony by a psychologist regarding the reliability of eyewitness identification. That the trial court possesses such discretion is, however, the necessary implication, since the *Hampton* opinion is couched solely in terms of discretion. Indeed, the *Hampton* court said, "We remain convinced that the decision of whether expert opinion testimony of psychologists and psychiatrists is to be permitted for purposes of impeaching a witness should rest within the trial court's discretion." 92 Wis. 2d at 457–58, 285 N.W.2d at 872. For the court of appeals to attempt to develop a per se rule regarding the admissibility of such testimony would be inconsistent with both that opinion and the general rule in this state regarding the admission of expert testimony. Accordingly, we conclude that whether the trial court admits or excludes such evidence, the test on review is the same: whether the trial court abused its discretion.[2]

---

[2] Our holding is consistent with the many federal and state appellate courts upholding a trial court's exercise of discretion to exclude such testimony. Federal cases affirming the right of a trial court in the exercise of its discretion to exclude such evidence include *United States v. Blade,* 811 F.2d 461, 464–65 (8th Cir. 1987); *United States v. Langford,* 802 F.2d 1176, 1179–80 (9th Cir.

## 2. *Trial Court's Ruling on Motion To Exclude*

We review a discretionary decision only to determine whether the trial court examined the facts of record, applied a proper legal standard, and, using a rational process, reached a reasonable conclusion. *Loy v. Bunderson,* 107 Wis. 2d 400, 414–15, 320 N.W.2d 175, 184 (1982). The question is not whether we agree with the trial court's decision but whether appropriate

1986); *United States v. Thevis,* 665 F.2d 616, 641–42 (5th Cir. 1982); *United States v. Fosher,* 590 F.2d 381, 382 (1st Cir. 1979); *United States v. Brown,* 540 F.2d 1048, 1053–54 (10th Cir. 1976). State courts upholding a trial court's exercise of its discretion to exclude such evidence include *Caldwell v. State,* 594 S.W.2d 24, 28–29 (Ark. Ct. App. 1980); *People v. Lawson,* 551 P.2d 206, 208–09 (Colo. Ct. App. 1976); *State v. Kemp,* 507 A.2d 1387, 1388–89 (Conn. 1986); *Johnson v. State,* 438 So. 2d 774, 777 (Fla. 1983), *cert. denied,* 465 U.S. 1051 (1984); *State v. Hoisington,* 657 P.2d 17, 29 (Idaho 1983); *People v. Clark,* 463 N.E.2d 981, 987 (Ill. App. Ct. 1984); *State v. Wheaton,* 729 P.2d 1183, 1186–88 (Kan. 1986); *State v. Coleman,* 486 So. 2d 995, 1000 (La. Ct. App. 1986); *State v. Fernald,* 397 A.2d 194, 197 (Me. 1979); *Commonwealth v. Francis,* 453 N.E.2d 1204, 1207–11 (Mass. 1983); *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn. 1980); *State v. Ammons,* 305 N.W.2d 812, 814 (Neb. 1981); *Porter v. State,* 576 P.2d 275, 278–79 (Nev. 1978); *State v. Porraro,* 404 A.2d 465, 471 (R.I. 1979); *State v. Wooden,* 658 S.W.2d 553, 556–57 (Tenn. Crim. App. 1983); *State v. Onorato,* 453 A.2d 393, 395–96 (Vt. 1982).

Different trial judges can properly exercise their discretion and reach opposite results as to identically situated parties. Whether a prosecutor or defendant may have the benefit of or avoid the harm resulting from expert testimony on eye witness identification therefore depends on the individual trial judge. Whether such disparate treatment should be tolerated when the public interest and personal liberty are at stake is not for the court of appeals to decide.

discretion was exercised. *Wollman,* 86 Wis. 2d at 464, 273 N.W.2d at 228.

We conclude that the trial court's ruling on the motion to exclude the expert's testimony was an abuse of discretion. The court had heard no testimony from the expert. Neither the prosecution nor the defense knew what the expert's testimony would be, and the state does not argue that the ruling should be sustained simply because the offer of proof was inadequate. The trial court therefore lacked a factual basis for its ruling. We cannot sustain an evidentiary ruling which lacks a factual basis in the record. *Maier Const., Inc. v. Ryan,* 81 Wis. 2d 463, 473, 260 N.W.2d 700, 704 (1978).

3. *Harmless Error Analysis*

The usual harmless error analysis assesses the error's effect on the verdict.

> [W]here the judge erred in the application of the rules of evidence to the case and that error was in respect to a crucial and controlling feature of the crime, the judgment should be reversed unless we can be sure that the error did not contribute to the guilty verdict.

*State v. Dyess,* 124 Wis. 2d 525, 547, 370 N.W.2d 222, 233 (1985).

This is not a case for the usual harmless error analysis. When Hamm moved for a new trial, the court reassessed its decision to exclude the expert's testimony. When making that reassessment, the court had before it an offer of proof the expert had prepared to describe his proposed testimony at a second trial. The offer covered his qualifications, the difficulties jurors have in evaluating the reliability of eyewitness

identifications, the psychological principles that govern eyewitness memory, and highlighted specific factors in the testimony known to *influence eyewitness reliability.*[3]

[3]According to the offer of proof, most lay persons believe that certain factors will enhance memory despite research evidence to the contrary. The primary influence on juror assessments of eye witness accuracy is the confidence expressed by the witness, but witness accuracy and witness confidence are poorly correlated. Witnesses grow more confident about their identifications as time passes. This means that jurors rely on cues or information of limited value in determining whether an identification is accurate. Confusion, misunderstanding, insensitivity and reliance on non-diagnostic information characterize lay/jury assessments of eye witness reliability.

The expert would testify that eye witness reliability can be analyzed in terms of four stages of information processing that are necessary for the formation and use of memory. His testimony would not cover limitations upon perception within the realm of everyday experience, such as illumination and distance. It would cover difficulties in estimating height and weight, the influence of expectations and the overestimation of the duration of events, as well as the role of attention in perception. When a weapon is present, attention is directed to the weapon and away from the perpetrator. As time passes it is increasingly difficult to retrieve information from the memory. "Original" memories can be changed by new or false information acquired after an incident. A disguise and simple changes in appearance can affect a witness's ability to make an accurate identification.

The expert identified certain factors regarding the accuracy of C.C.'s identification of Hamm and their impact on the jury. The assault took place under poor illumination with the perpetrator's face covered by a towel. The victim was threatened with a knife. She likely experienced fear and stress, which impair memory. Memory for voices is inferior to the memory for faces. Jurors should know that witness confidence is not a reliable guide to identification accuracy, and rather than rely on confidence jurors should evaluate the accuracy of identification in terms of the

The trial court concluded that the information the expert would provide was well within the jurors' common knowledge and that the expert's testimony was therefore unnecessary. The court relied in part on the reasoning in *Hampton,* 92 Wis. 2d at 461, 285 N.W.2d at 873, where the court said

> Furthermore, where the supposedly mistaken identity is claimed to have resulted from facts which similarly affect all persons' ability to accurately perceive, rather than a certain defect or disability from which a particular witness is claimed to suffer, the need for expert testimony would seem to diminish significantly. All people, including those serving on a jury, recognize at least to some extent the difficulties involved in attempting to accurately perceive and remember events in stressful situations. For these reasons, then, we are unable to say that the trial court abused its discretion in limiting the expert testimony of the psychologist offered in this case.

The trial court ruled that the use of the expert's testimony would tend to divert the attention of the jurors from material issues and unduly lengthen the trial, and that the use of such testimony would tend to make the expert witness a "superjuror," thus usurping the role of the jury as finder of fact.[4]

circumstances underlying the identification. They should know that the initial identification must be critically examined, since later identifications tell virtually nothing about the quality of the original memory or the accuracy of the initial identification.

[4]*Compare* the *Hampton* court's approval of a trial court's refusal to allow an expert's testimony regarding the reliability of a particular eyewitness's testimony: "The use of expert testimony in circumstances such as those present here could not only lengthen

■ We conclude that the trial court, when deciding the post-trial motion, reached its decision regarding the admissibility of the expert witness testimony on the basis of a logical rationale and the facts of the record before it, consisting of the offer of proof. Having reached that conclusion, our review of the trial court's ruling stops. Whether we would have ruled differently is not the question. The trial court did not abuse its discretion when it rejected the expert's testimony proposed for a second trial.

We return to the harmless error issue. Had the defense made the same offer of proof during the trial that it made to support a new trial, the court undoubtedly would have made the same decision based upon the same reasoning. Under these circumstances, it would be absurd for us to find that the ruling during the trial was harmful error. We hold it was not.

We therefore decline to reverse on the basis of the decision at the trial to exclude the expert's testimony. We also decline to order a new trial on the basis of Hamm's post-conviction motion.

4. *Right to Present a Defense*

Hamm concludes that exclusion of the expert's testimony violated his right to due process and to present a defense. We disagree.

■ Although the due process clause of the fourteenth amendment to the United States Constitution requires that criminal defendants be afforded "a mean-

the time and increase the cost of trials, but it could also divert the minds of the jurors from the true issues in the case or cause them to abdicate their role as the 'lie detector' in the courtroom." 92 Wis. 2d at 461, 285 N.W.2d at 873.

ingful opportunity to present a complete defense," *Crane v. Kentucky,* 476 U.S. 683, 690 (1986), the right is not absolute. Trial courts possess wide latitude to exclude evidence for proper reasons, one of which is confusion of the issues. *Id.* at 689–90. Wisconsin law recognizes confusion as well as considerations of undue delay or waste of time as proper reasons to exclude relevant evidence. Sec. 904.03, Stats. The trial court's ruling was based partly upon all of those factors.

The absence of a "Hampton-type" instruction, coupled with exclusion of his expert's testimony, did not undermine Hamm's right to make a defense. First, we have already concluded that the exclusionary ruling did not violate his right to present a defense. Second, he did not request a special identification instruction. Error cannot be predicated on the absence of an instruction which was never requested. *McGivern v. Amasa Lumber Co.,* 77 Wis. 2d 241, 247, 252 N.W.2d 371, 374 (1977). Third, in view of the instructions it gave to the jury, the trial court was not required to give the special instruction. *Hampton,* 92 Wis. 2d at 462–64, 285 N.W.2d at 874–75; *Johnson,* 118 Wis. 2d at 476–77, 348 N.W.2d at 199.

## D.

### *ADMISSION OF YELLOW TOWEL IN EVIDENCE*

Hamm contends that the trial court should have excluded from evidence the towel found shortly after the 1985 sexual assault in a dumpster near his apartment building. Hamm contends that the size and shape of the towel did not match those belonging to

B.C., hair found on the towel did not match that of either B.C. or Hamm, and B.C. could not identify it as her towel. Hamm concludes that no reasonable basis existed to introduce the towel in evidence.

Although B.C. did not specifically identify the towel as her own, she testified that it was "like" a yellow bath towel that had been part of a set and which was missing after her assault. The remaining towel in her set had the same color, the same "Cannon" label in red lettering with a white background, and similar printing on the back of the label. The towels were almost the same size. One was 42" × 22-¼", and the other was 41" × 22". An expert on hair identification testified that the hair found on the towel could have come from either Hamm or B.C.

The trial court ruled that the towel was relevant to show identification and had probative value, which was not outweighed by its possible prejudicial effect. The admission of evidence is discretionary. *Chomicki v. Wittekind,* 128 Wis. 2d 188, 195, 381 N.W.2d 561, 564 (Ct. App. 1985). The similarities between the towels were such that the trial court did not abuse its discretion.

### E.

### *INEFFECTIVE ASSISTANCE OF COUNSEL*

The standards used to decide ineffective assistance claims are stated in *Strickland v. Washington,* 466 U.S. 668, 687 (1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel

was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

The *Strickland* court added:

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. ... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed.

*Id.* at 697.

Hamm contends that trial counsel was ineffective in four respects: counsel failed to produce canceled checks which Hamm claimed he had cashed with various liquor vendors during the evening of March 1 and the early morning hours of March 2, 1985; counsel failed to show that during that time the floorboard areas of his wife's car and of his car were littered with empty beer cans; counsel should have objected to admission of a steak knife found in Hamm's car after the 1985 incident; and counsel should have requested a "Hampton-type instruction" listing the factors that can affect an individual identification. Following an evidentiary hearing at which trial counsel testified, the court rejected Hamm's contentions.

Hamm contends that the bank checks tend to corroborate his intoxication and alibi claims. The trial court held that since the time of the 1985 assault was

long after local bars had closed, the checks did not tend to establish Hamm's alibi, and nothing indicated that Hamm drank all the alcohol he bought. Hamm contends that because B.C. testified that her assailant had not been drinking, the trial court's analysis fails. The checks add little to that contention. A police officer who had contact with Hamm shortly after the assault testified that Hamm smelled of intoxicants. Hamm's wife said he smelled of intoxicants during the early morning hours of March 2, 1985. A bartender testified that by 12:30 a.m. that morning he stopped serving drinks to Hamm because he appeared to be too intoxicated. Failure to use the checks at the trial did not prejudice Hamm. For the same reasons, counsel's failure to produce evidence regarding the beer cans was not prejudicial.

Shortly after Hamm's arrest on March 2, 1985, the police found a steak knife in his car. The knife was put in evidence without objection, even though it was not identified as having originated in B.C.'s apartment. Hamm argues that the knife suggests that he was a bad person, confused the jurors, and led some to believe that the perpetrator's knife had been found in his car. We conclude that admission of the knife was not prejudicial. A serrated steak knife hardly suggests that its possessor is a bad person. Hamm explained he used the knife to start his car engine because the ignition key had broken off inside the lock. Because Hamm's wife identified the knife as being from their apartment, the jury could not have confused the source of the knife or believed it belonged to B.C.

We reject the contention that counsel should have sought a "Hampton-type" instruction on eyewitness identification. As we have already held, Hamm had no right to it.

We conclude that Hamm has failed to show he was rendered ineffective assistance of counsel.

## F.

### *SENTENCES*

Hamm next contends that by sentencing him for a total of 105 years, the trial court grossly abused its discretion. He complains that the three incidents were "fractionalized" into eleven counts: three burglary as repeater counts, seven first-degree sexual assault counts with a penalty enhancer for concealing identity and the repeater law, and an enhanced count of attempted first-degree sexual assault. He emphasizes that in each incident the assailant was armed with a knife but had not used it, no victim was injured or disfigured, no attempt was made to kill anyone, no intercourse or wanton or extreme cruelty occurred, and no attempt was made to humiliate the victim.

In another case involving the claim that a lengthy sentence for sexual assault was excessive, we noted that we review a sentence for abuse of discretion, that a strong policy exists against interfering with the trial court's sentencing discretion, and that although an abuse may be found if the trial court failed to state on the record the material factors which influenced its decision or gave too much weight to one factor or relied on irrelevant or immaterial factors, the weight to be given to each relevant factor is within the wide discretion of the trial court. *State v. Curbello-Rodriguez*, 119 Wis. 2d 414, 433–34, 351 N.W.2d 758, 767–68 (Ct. App. 1984). We noted, "Whether or not this court may have imposed a different sentence in this case, the question on appeal is did the trial court abuse its

discretion." *Id.* at 434, 351 N.W.2d at 768. The relevant factors for the court to consider are protection of the public, gravity of the offense and the rehabilitative needs of the defendant. The court may also consider other factors, such as criminal record, undesirable behavior patterns, personality, character and social traits, presentence investigations, etc. *Id.* at 433, 351 N.W.2d at 767.

Here the trial court expressed its view that a most serious set of crimes had occurred, crimes enhanced by repetition, masking, and being armed. In the court's view, the damage to the victims was enormous and not measurable, particularly in the case of the two children. The court found that Hamm cannot control his behavior. The court referred to Hamm's record of prior offenses of attempted sexual assault, and that the record reflected planning, cunning, stalking, and carefully planned encounters perhaps enhanced by alcohol, which resulted in serious crimes. The court concluded that severe punishment was necessary. The court was satisfied that Hamm is a danger to the public and should be prevented from moving in society for a long period. The court believed that rehabilitation may be possible, but that the need for protection, the recognition of damage to the victims and the deterrent effect of a heavy sentence required a severe sentence.

Hamm asserts that a 105–year sentence is not the minimum necessary to protect the public. We disagree. In 1981 Hamm was sentenced in Texas for aggravated attempted rape. He was paroled in 1982 and returned to Wisconsin. In September 1983 he attempted to enter the bedroom window of another woman. While on probation for a misdemeanor arising

out of that incident, he committed the offenses against B.C. Those circumstances, coupled with the convictions before us, justify the inference that a lengthy sentence is necessary to protect the public.

Hamm presents a series of contentions to the effect that merely because the legislature provides harsh penalties for specific crimes does not mean that an individual case warrants them or that they should be given much weight in sentencing. On the contrary, a trial court may properly consider the legislature's view of the seriousness of a crime as expressed by the maximum sentence. Nor is the fact that the incidents were "fractionalized" into eleven counts a circumstance which under the present stage of the law requires separate consideration by the sentencing court.

The trial court was not required to explain its reasons for deviating from the recommendations by a defense social worker that Hamm receive sentences totaling fifty years and by a parole agent that he receive ninety years. The court's explanation of the rationale behind the sentences it imposed is sufficient.

Hamm's last contention is that the trial court provided no adequate rationale for consecutive sentencing. Case law does not satisfactorily set forth the considerations a trial court should employ when deciding whether sentences are to be served concurrently or consecutively. The rule is said to be that the same factors concerning trial court discretion as to the length of a sentence apply to a determination whether sentences should be served concurrently or consecutively. *Cunningham v. State,* 76 Wis.2d 277, 284–85, 251 N.W.2d 65, 69 (1977), cited in *Curbello-Rodriguez,* 119 Wis. 2d at 436, 351 N.W.2d at 769. Since the weight to be given to each factor is within the wide discretion of

the sentencing judge, *Cunningham,* 76 Wis. 2d at 285, 251 N.W.2d at 69, little guidance is provided to a reviewing court when deciding whether a trial court abuses its discretion in imposing consecutive rather than concurrent sentences for multiple convictions. *See* concurring opinion in *Curbello-Rodriguez,* 119 Wis. 2d at 436–38, 351 N.W.2d at 760–70, suggesting that recourse be had to certain ABA standards to determine whether sentences should be consecutive.

In any event, the trial court had a reasonable rationale for consecutive sentences. When making the burglary sentences consecutive to sentences for sexual assault, the court explained that it did so because recognition must be given to the sanctity of the home. That is a reasonable explanation. No explanation is necessary for making separate sexual assault counts involving different persons at different times and locations consecutive to each other. It is entirely reasonable to make those sentences consecutive.

We conclude that the trial court did not abuse its discretion when sentencing Hamm.

*By the Court.*—Judgment of conviction and order denying new trial affirmed.