STATE of Wisconsin, Plaintiff-Appellant,

v.

Allerd SHARLOW, Defendant-Respondent-Petitioner.

Supreme Court

*No. 81–207–CR. Argued November 2, 1982.—*
*Decided January 5, 1983.*

(Also reported in 327 N.W.2d 692.)

For the defendant-petitioner the cause was argued by *Ben Kempinen*, staff attorney, Legal Assistance to Institutionalized Persons Program, with whom on the briefs was *Frank J. Remington*, professor of law.

For the plaintiff-appellant the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

LOUIS J. CECI, J.   On September 15, 1972, a jury found the defendant, Allerd Sharlow, guilty of first-degree murder, party to a crime, under secs. 939.05[1] and 940.01,[2] Stats. 1971. Sharlow brought a motion for post-conviction relief pursuant to sec. 974.06,[3] on Sep-

---

[1] Section 939.05, Stats. 1971, provides:

"**Parties to crime.** (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the person who directly committed it has not been ,convicted or has been convicted of some other degree of the crime 'or of some other crime based on the same act.

"(2) A person is concerned in the commission of the crime if he:

"(a) Directly commits the crime; or

"(b) Intentionally aids and abets the commission of it; or

"(c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. Such a party is also concerned in the commission of any other crime which is committed in pursuance of the intended crime and which under the circumstances is a natural and probable consequence of the intended crime. This paragraph does not apply to a person who voluntarily changes his mind and no longer desires that the crime be committed and notifies the other parties concerned of his withdrawal within a reasonable time before the commission of the crime so as to allow the others also to withdraw."

[2] Section 940.01, Stats. 1971, provides:

"**First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

[3] Section 974.06(1), Stats., provides:

"**Post-conviction procedure.** (1) After the time for appeal or post-conviction remedy provided in s. 974.02 has expired, a prisoner in custody under sentence of a court claiming the right to be released upon the ground that the sentence was imposed in violation

tember 6, 1979, contending that he had been denied the constitutional right to call witnesses in his own defense. The court of appeals reversed the circuit court's order granting Sharlow a new trial. *State v. Sharlow,* 106 Wis. 2d 440, 317 N.W.2d 150 (Ct. App. 1982). Sharlow appeals from that decision.

Two major issues are presented: (1) Whether it was constitutional error to prevent the defendant from presenting the testimony of two witnesses concerning hearsay statements allegedly made by a codefendant, and (2) whether the trial court's instruction on accomplice liability created an impermissible risk that the defendant's jury did not understand that this theory required a finding that the defendant intended the death of the victim. Because we believe that the testimony was properly excluded under the criteria enunciated by the United States Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284 (1973), and because we believe the jury instructions were proper, we affirm.

This case has already been before this court on Sharlow's direct appeal from his conviction in *State v. Sharlow,* 61 Wis. 2d 388, 212 N.W.2d 591 (1973), which was decided on evidentiary, rather than constitutional, grounds. Many of the same facts are pertinent to this review.

On the night of May 1, 1972, Thomas Blanchette and Jerry Kruschke were at Sally's Tavern in the city of Milwaukee. The victim, Edwin Harry Frahm, later joined them at the bar and the three left Sally's, inviting the bartender, Randall Lydolph, to meet them at the

of the U.S. constitution or the constitution or laws of this state, that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

Driftwood Tavern for a drink. After closing Sally's, Lydolph went to the Driftwood. When Lydolph arrived at the Driftwood, he did not notice whether Sharlow was with Blanchette, Kruschke and Frahm. At Sharlow's trial, Lydolph testified that he overheard a conversation in the men's room between Sharlow and Blanchette in which Blanchette stated, "I'm going to get this little fink," referring to Frahm. Sharlow said, "Let me do it; I want him," and Blanchette replied, "No, he's mine." After Blanchette and Sharlow came out of the men's room, the two stood and talked for "about two minutes." Lydolph also saw Kruschke leave the Driftwood "about three times." Each time Kruschke returned, he engaged in a conversation with Blanchette. Lydolph did not remember where Sharlow was at this time.

Kruschke, who had been granted immunity, testified that he had left the tavern to go back to the apartment he shared with Blanchette and get Blanchette's revolver. He came back because he couldn't get into the apartment. Finally, Arthur McConkey, a neighbor, gave the gun to Kruschke. Kruschke gave the revolver to Blanchette in the men's room at the Driftwood. This occurred before Sharlow's conversation with Blanchette in the men's room.

Lydolph saw a group of four or five people, which included at least Kruschke and Frahm, leave the tavern together. He observed them drive off in a Corvair. Kruschke testified that he, Blanchette, Frahm and Sharlow left the Driftwood, driving off in Sharlow's Corvair. Kruschke was driving, at Blanchette's request; Frahm was in the front passenger seat; and Blanchette and Sharlow were in the rear seat. Sharlow was seated behind Frahm, and Blanchette was behind the driver. Kruschke testified that he heard a shot ring out and saw Frahm slump in his seat. Kruschke immediately looked in the rearview mirror and saw Sharlow holding

the gun. At the same time, Sharlow was asking Blanchette if Sharlow should give Kruschke "a couple." Blanchette replied, "Leave him alone; he's all right." Blanchette then told Sharlow, "Give him [Frahm] another one." After more shots were fired, Kruschke saw Sharlow hand the revolver to Blanchette. Blanchette then directed Kruschke to drive to the spot where Frahm's body was found. Kruschke testified that Blanchette and Sharlow dragged the body to a creek, where they disposed of it.

Two days later, Frahm's body was discovered in a creek in New Berlin. A spent cartridge and red spots were found on a nearby driveway. An autopsy showed that the victim had been shot in the head five times.

At the trial, the pathologist testified that at least two of the bullets were fired at very close range—one to five inches. All of the wound trajectories angled downward and to the right.

Codefendant Blanchette's trial was severed from Sharlow's. At Sharlow's trial, the defense called Blanchette as a witness; however, Blanchette invoked his Fifth Amendment privilege.

The defense then proffered the testimony of Sharon Henne and James McNeal. If permitted to testify, Henne would have testified that Blanchette told her that "he was the one that had shot this person six times in the head," and that on another occasion, Blanchette asked her "if I would believe him if he told me that he had not actually done the shooting but that Al [Sharlow] did and he wasn't going to 'sit' any more for something he didn't do." She also would have stated that she had known Blanchette for three months and had seen him daily in that period. If permitted to testify, McNeal would have testified that he shared a jail cell with Blanchette and that Blanchette told him that while in the car, he solicited Sharlow to participate in the mur-

der; that Sharlow refused and grabbed Blanchette's arm and struggled with him in an attempt to prevent the shooting; that Blanchette shot Frahm after he wrestled the gun from Sharlow; and that he and Kruschke were roommates and shared a homosexual relationship, a relationship denied by Kruschke at trial.

The circuit court granted Sharlow a new trial pursuant to sec. 974.06, Stats., finding that the constitutional issues raised were not disposed of in the previous *Sharlow* decision. The court relied on *State v. Brown*, 96 Wis. 2d 238, 291 N.W.2d 528 (1980), which substantially adopts the *Chambers* criteria, and held that Sharlow's due process right to present a defense had been violated by a strict application of the hearsay rule. The state's motion for reconsideration was denied.

The court of appeals found that it was error to refuse to admit the hearsay statements, but that the error was harmless. The court noted that Sharlow was convicted of first-degree murder, party to a crime, and that admission of evidence which may create doubt that Sharlow did the actual shooting does not alone establish that he did not aid the person who did the shooting or was not a party to a crime. The court held that the evidence proved beyond a reasonable doubt that Sharlow was a party to the crime of first-degree murder. 106 Wis. 2d at 449. The court of appeals, however, did not address the issue of the propriety of the jury instructions.

## I.

### Exclusion of Hearsay Statements

This issue has been addressed by this court in *State v. Brown*, 96 Wis. 2d 238, which presented a somewhat similar set of facts. As in *Brown*, the defendant in this case was tried and convicted before January 1, 1974, the

effective date for the Wisconsin Rules of Evidence, 59 Wis. 2d Rvii (1973). Under the current rules, hearsay statements against the declarant's penal interest are admissible under certain circumstances.[4] However, under the then applicable rule, which provided exceptions for statements against proprietary or pecuniary interest, but not for statements against penal interest, the statements of Henne and McNeal were excluded as inadmissible hearsay. *State v. Johnson*, 60 Wis. 2d 334, 339, 210 N.W. 2d 735 (1973); *State v. Sharlow*, 61 Wis. 2d at 394–96.

Therefore, the outcome of this case necessarily turns on whether Wisconsin's hearsay rule has been "applied mechanistically to defeat the ends of justice." *Chambers v. Mississippi*, 410 U.S. at 302. The defendant in *Chambers* was charged with the murder of a policeman. Another man, McDonald, had confessed to the crime and then renounced his earlier confession. Applying Mississippi's "voucher" rule,[5] the trial court did not allow the defendant to examine McDonald as an adverse witness and challenge McDonald's renunciation of his earlier confession. *Id.* at 291.

Chambers then attempted to introduce the testimony of three witnesses to whom McDonald had admitted that

---

[4] Section 908.045(4), Stats., provides:

"**Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborated."

[5] Under this Mississippi common law rule, a party may not impeach his own witness, since the party is viewed as vouching for the credibility of the witness. *Clark v. Lansford*, 191 So. 2d 123, 125 (Miss. 1966).

he shot the officer. During the testimony of the first witness, the state objected, arguing that the testimony was inadmissible hearsay. The trial court sustained the objection and ordered the jury to disregard the testimony. The testimony of the other two witnesses was not admitted.

The supreme court first concluded that Mississippi's "voucher" rule, as applied in Chambers' case, unconstitutionally interfered with his right to defend against the state's charges. *Id.* at 298. The court then held that the strict application of Mississippi's hearsay rule also denied Chambers his fundamental right to a fair trial.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Id.* at 294.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 302.

The hearsay rule may not be applied mechanistically where proffered testimony is critical to a defendant's defense and bears persuasive assurances of trustworthiness. *Id.* The court listed the circumstances which provided the hearsay statements in *Chambers* with assurances of trustworthiness.

"First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case—McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably

against interest. . . . Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." *Id.* at 300–01 (citations omitted).

In *State v. Brown,* this court applied the four *Chambers* considerations and concluded that the trial court did not abuse its discretion in assessing the reliability of the circumstances surrounding the declarations or violate the defendant's right to present a defense.[6] 96 Wis. 2d at 246.

The holding in *Chambers* was a narrow one, and the question of whether an evidentiary rule has been mechanistically applied must be decided on a case-by-case basis. The *Chambers* court stated:

"[W]e hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." 410 U.S. at 303.

Sharlow asserts that the hearsay testimony of both Henne and McNeal was sufficiently critical and reliable

---

[6] The defendant in *State v. Brown,* 96 Wis. 2d 238 (1980), was charged with armed robbery. The two victims had identified the defendant as one of the robbers. The defense proffered the testimony of James Holmes. Holmes would have testified that he bought one of the stolen items, a radio, from two men, Chiles and Willis, who told him that they committed the robbery. This court acknowledged that the statements of Chiles and Willis were against their penal interest and were made spontaneously and shortly after the robbery occurred. However, Holmes had only known the men for a period of a few weeks, at the most. He did not know the whereabouts of either declarant, and their names were not listed in the telephone directory. Moreover, there apparently was no corroborating evidence that Holmes ever possessed such a radio. *Id.* at 246. The trial court rejected the offer of proof because it was uncorroborated hearsay and because the proffered testimony was " 'untrustworthy under all of the circumstances presented.' " *Id.* at 240.

to be admitted at his trial. In *State v. Brown,* we noted that the proffered testimony was critical to the defendant's case, since if the testimony and the declarants' hearsay statements were believed, the defendant would have been exculpated. 96 Wis. 2d at 246–47. This is not true of Blanchette's hearsay statements to Henne. The fact that Blanchette may have told Henne that he had shot Frahm would not have exculpated Sharlow, since Sharlow was charged with being a party to the crime of murder. Under these circumstances, the statements are not so critical to Sharlow's defense that their exclusion denies him a fair trial.[7]

Additionally, under *Chambers,* Blanchette's statement to Henne that he shot the victim does not bear persuasive assurances of trustworthiness. Two of the four *Chambers* criteria are present. Blanchette's statement was made to Henne, his girlfriend, shortly after the murder had occurred. The statement was certainly self-incriminating and against Blanchette's penal interest. However, Blanchette took the stand and invoked his Fifth Amendment right to remain silent. Thus, unlike *Chambers,* the declarant was not available to testify. *West v. State,* 74 Wis. 2d 390, 400, 246 N.W.2d 675 (1976). Without the opportunity to cross-examine Blanchette in regard to his out-of-court statement, the jury would have been seriously hindered in assessing the truth of the statement. *Chambers,* 410 U.S. at 301.

At trial, the pathologist testified that all of the bullets were angled downward and to the right through the victim's head. Sharlow contends that this corroborates the fact that the bullets were fired from Blanchette's position in the car. However, the pathologist testified that she could not express an opinion as to where the weapon was located when it was fired, other than her

---

[7] *See U.S. v. Hughes,* 529 F.2d 838, 841 (5th Cir. 1976); *State v. Turner,* 623 S.W.2d 4, 9 (Mo. 1981); *Garcia v. State,* 155 Ga. App. 445, 271 S.E.2d 13 (1980).

opinion that two of the bullets were apparently fired from very close range. Sharlow's theory that the angle of the bullets indicates that Blanchette fired the weapon would thus appear to be highly speculative, especially since the position in which Frahm held his head is not known. As such, this evidence would not corroborate Blanchette's statement to Henne that Blanchette shot Frahm.[8]

It should be noted that the *Chambers* factors are not " 'exhaustive and absolute.' " *State v. Brown*, 96 Wis. 2d at 245; *U.S. v. Guillette*, 547 F.2d 743, 754 (1976). In *Green v. Georgia*, 442 U.S. 95, 97 (1979), the court held that the exclusion of testimony concerning a hearsay statement by a codefendant denied Green, the defendant, a fair trial on the issue of punishment. The court stated that substantial reasons existed to assume the reliability of the testimony, noting that the first three *Chambers* criteria were present and that

"[p]erhaps most important, the State considered the testimony sufficiently reliable to use it against [the codefendant], and to base a sentence of death upon it." *Id.*

Sharlow contends that the state relied on a portion of the excluded testimony at Blanchette's trial and that, therefore, under *Green*, the testimony was sufficiently reliable to be admitted at Sharlow's trial. However, the record shows that the state did not rely on Blanchette's statement to Henne that he (Blanchette) shot Frahm. In his closing argument to the jury, the prosecutor argued that the evidence showed that Sharlow was the "trigger-

---

[8] Moreover, Blanchette's statements to Henne contradict each other. On one occasion, Blanchette allegedly told Henne that he (Blanchette) had shot someone. Henne testified that on a later occasion: "He [Blanchette] asked me [Henne] if I would believe him if he told me that he had not actually done the shooting but that Al [Sharlow] did and he wasn't going to 'sit' any more for something *he didn't do.*" (Emphasis added.) We feel that this further indicates a lack of trustworthiness.

man," while Blanchette was the leader in planning the crime.

While Blanchette's statements to Henne, even if believed, would not have exculpated Sharlow from guilt as an aider and abettor, his statement to McNeal did tend to completely exonerate Sharlow. If believed, his statement to McNeal painted a picture of Sharlow as one who took no part in the plan to kill the victim and who may have actively attempted to prevent the shooting. The state has conceded this much in its brief and oral argument. However, under the *Chambers* analysis, the statement does not bear persuasive assurances of trustworthiness.

It may be that Blanchette's statement to McNeal was against Blanchette's penal interest. However, unlike the statements in *Chambers,* Blanchette's statement to McNeal was made a month after the murder occurred. In *Chambers,* the statements were "made spontaneously to a close acquaintance. . . ." McNeal was Blanchette's cell mate, and the record does not indicate that the two men had known each other for a substantial length of time.

As we stated in our discussion of Blanchette's statement to Sharon Henne, we do not believe it is accurate to say that the angle of the bullets through the victim's head corroborates the theory that Blanchette did the actual shooting. Even if it did provide some corroboration, it in no way exculpated Sharlow from guilt as an aider and abettor. Moreover, unlike *Chambers,* the various hearsay statements do not corroborate each other, since some of the hearsay statements to Henne contradict each other and also are inconsistent with Blanchette's statement to McNeal. Thus, with respect to the part of the statement that was critical to Sharlow's defense— Blanchette's statement to McNeal that Sharlow tried to prevent the shooting—corroboration is lacking.[9]

---

[9] Sharlow contends that this court should consider the fact that Blanchette's hearsay statements against his penal interest would

Finally, as was the case with Henne's proffered testimony, Blanchette was not available to testify and be cross-examined concerning his declarations, since he had invoked his Fifth Amendment privilege against self-incrimination.

Thus, we disagree with the court of appeals' holding that it was error, albeit harmless error, to exclude the hearsay testimony of Henne and McNeal.

## II.

### Jury Instruction

Sharlow also contends that the jury instruction on accomplice liability violated his right to due process of law because it failed to inform the jury that conviction of first-degree murder as an aider and abettor required a finding that the defendant acted with a mental purpose to take the life of the victim.

Under Wisconsin law, a person may be convicted as a party to a crime, even though he did not directly commit it, if he "[i]ntentionally aids and abets the commission of it. . . ." Section 939.05 (2) (b), Stats. Sharlow argues that this section requires that the defendant share the intent required for direct commission of the offense in order to be convicted as an aider and abettor. We disagree.

The jury was given the following instruction on aider and abettor liability, which is in accord with the standard jury instruction, Wis. JI—Criminal, No. 400A:

"A person intentionally aids and abets the commission of a crime when, acting with knowledge or belief that another person is committing or intends to commit a

be admissible under the present Wisconsin Rules of Evidence. However, we feel that this argument assumes too much, since under sec. 908.045 (4), Stats., Blanchette's statement would not be admissible unless corroborated.

crime, he knowingly either (a) renders aid to the person who commits the crime, or (b) is ready and willing to render aid, if needed, and the person who commits the crime knows of his willingness to aid him. If a person intentionally aids and abets the commission of a crime, then that person is guilty of the crime as well as the person who directly committed it."

This standard instruction has been used in Wisconsin for almost twenty years and has been approved by this court even where, as here, the defendant was charged with first-degree murder as a party to a crime. *State v. Cydzik,* 60 Wis. 2d 683, 693, 211 N.W.2d 421 (1973).

We also reject any contention that under sec. 939.05, Stats., only a conspirator or a solicitor[10] can be held liable for a crime other than the intended crime. *State v. Asfoor,* 75 Wis. 2d 411, 430, 249 N.W.2d 529 (1977). The legislative history of sec. 939.05(2)(b) does not support the interpretation advanced by Sharlow.[11] Rather, the statute requires that the actor "knowingly" render aid in the commission of the crime.

We are of the opinion that the standard jury instruction conforms to recognized principles of aider and abettor liability. The defendant contends that his position is supported by *State v. Nutley,* 24 Wis. 2d 527, 129

[10] *See,* sec. 939.05(2)(c), Stats.

[11] *See,* Judicial Committee Report on the Criminal Code (Wisconsin Legislative Council, 1953), at pp. 4–6. With respect to sec. 939.05(2)(b), the Committee's comment provides:

"Paragraph (b) covers those who assist in the commission of the crime. The term 'aids and abets' is a phrase of art which covers assistance which is rendered by words, acts, encouragement or support. It even includes presence, whether actual or constructive, if the person is present for the purpose of rendering assistance if necessary. See Black's Law Dictionary and cases cited therein. Although the term 'aid and abet' has always been construed to mean assistance with knowledge that the actor is aiding and abetting in the production of a criminal result, 'intentionally' was added to emphasize this fact."

N.W.2d 155 (1964).[12] However, in later decisions this court has discussed *Nutley* as follows:

"Aiding and abetting has been explained in *Hawpetoss v. State*, 52 Wis. 2d 71, 187 N.W.2d 823 (1971). Therein we defined those "concerned in the commission" of a crime and stated:

" 'The elements of complicity, or aiding and abetting are that a person (1) undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime, and further (2) he consciously desires or intends that his conduct will yield such assistance.' (at 78)

"In that same case we pointed out that, where one person *knew* the other was committing a criminal act, he should be considered a party thereto when he acted in furtherance of the other's conduct, *was aware* of the fact that a crime was being committed, and acquiesced or participated in its. perpetration. See also *State v. Nutley*, 24 Wis. 2d 527, 129 N.W.2d 155 (1964); *State v. Haugen*, 52 Wis. 2d 791, 191 N.W.2d 12 (1971); *Taylor v. State*, 55 Wis. 2d 168, 197 N.W.2d 805 (1972); and *State v. Cydzik*, 60 Wis. 2d 683, 211 N.W.2d 421 (1973). These cases hold that defendants may be found guilty of being concerned in the commission of a crime if, between them, they perform all the necessary elements of the crime with *mutual awareness* of what the other is doing. It is not necessary that each defendant be present at the scene of the crime."

*Roehl v. State*, 77 Wis. 2d 398, 407–08, 253 N.W.2d 210 (1977) (emphasis added).

---

[12] The defendant emphasizes the following language from *State v. Nutley*, 24 Wis. 2d at 554–55:

"Under the complicity theory of sec. 939.05(2)(b), a person is liable for the substantive crime committed by another if (1) he undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime, and further if (2) he consciously desires, or 'intends' that his conduct will yield such assistance. He must consciously direct his conduct toward the realization of the criminal objective. He must have a 'stake in the outcome.' " (Footnotes omitted.)

Thus, we believe that the jury instruction in question correctly informs a jury of the requirements for conviction as an aider and abettor under sec. 939.05(2)(b), Stats.[13]

Therefore, since we find no error in either the exclusion of the proffered testimony or the jury instructions on criminal liability as an aider or abettor, we affirm.

*By the Court.*—The decision of the court of appeals is affirmed.

CALLOW, J., took no part.

---

[13] Sharlow also argues that even if this court reaffirms the interpretation of *State v. Cydzik*, 60 Wis. 2d 683, that aider and abettor liability is extended to any crime that was "committed as a natural and probable consequence of the intended criminal acts" as well as the crime the defendant knowingly aided and abetted, reversal of his conviction is required. *State v. Asfoor*, 75 Wis. 2d 411. The defendant contends that the jury should have been instructed on the *Cydzik-Asfoor* theory of liability. We agree with the state that since this theory was never implicated in Sharlow's case, such an instruction was not required.