STATE of Wisconsin, Plaintiff-Respondent,

v.

Daniel Lee AMOS, Defendant-Appellant.†

Court of Appeals

*No. 88-2235-CR, 88-2236-CR. Submitted on briefs July 11, 1989.—Decided November 15, 1989.*

(Also reported in 450 N.W.2d 503.)

† Petition to review denied.

For the plaintiff-respondent the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, by *Marguerite M. Moeller,* assistant attorney general.

For the defendant-appellant the cause was submitted on the briefs of *David J. Leeper,* of Monroe.

Before Moser, P.J., Sullivan and Fine, JJ.

MOSER, P.J. Daniel Lee Amos (Amos) appeals from judgments affirming a jury verdict finding him guilty of armed burglary in violation of sec. 943.10(1)(a), Stats., and on his no contest plea to escape in violation of sec. 946.42(3)(a), Stats.

On appeal, Amos makes the following claims. First, the trial court erred in failing to suppress the seizure of himself and his property. Second, the trial court erred in allowing the jury to hear evidence of Amos's attempt to suborn perjury as such evidence was inadmissible and prejudicial. Third, the trial court denied Amos his due process and confrontation rights of presenting and confronting witnesses. Fourth, the trial court denied Amos a fair trial when it refused to give his theory of defense instruction. Fifth, the trial court violated Amos's double jeopardy rights when it *sua sponte* and without notice modified his sentence after it had begun. Because the trial courts did not err in any of Amos's above claims, we affirm.

Delbert and Agnes Anderson resided at 1103 Kriedeman Drive in the city of Stoughton, Dane county, Wisconsin. On November 23, 1985, they arrived home at approximately 5:45 p.m. After Agnes entered the home through the back door, she bent down to take her boots off when she heard footsteps coming from the living room. An intruder ran past her, pushing her in the back of the head and pushed her down. The intruder ran out the back door through the garage. Next, Agnes called out to her husband that an intruder had been in their home. Agnes called the police. After the police arrived, they searched the Andersons' home to determine if anyone else was inside. No one else was inside. The police found one of the Andersons' kitchen knives beside Mrs. Anderson's jewelry and jewelry box, a camera and camera equipment and other items in a black plastic garbage

bag, which was placed on top of a bedsheet near the front door in the living room. The police also found the Andersons' video cassette recorder disconnected and lying tipped on the floor against the television set in the living room.

The police found a lighted flashlight in the snow behind the Andersons' residence, along with a set of footprints tracked in the snow from boots that had a waffled or lug pattern. They followed this singular set of tracks across the back of the Andersons' property to the front of the next door neighbor's property and around the back of another residence located on Kriedeman Drive. This house was the residence of Cathy Jo Nelson (Nelson).[1] The footprints led to the rear entry door of the garage of Nelson's residence. This door had been previously broken open, and was held partially closed by a concrete block being placed against it. The police opened the door and noted the same footprints of snow on the concrete floor of the garage, which led up to the rear entry door of this residence.

The police surrounded the building and waited for authorization to enter. The Stoughton chief of police advised the officers to telephone the residence and if there was no response, to use the police squad public address system. If there was still no response, the officers were instructed to enter the premises to search the property. The police authorities on the scene had the dispatcher telephone the Nelson residence. After failing to receive a response, they used a squad car's public address system, which also failed to result in a response. Finally, they entered the residence to search the premises.

First, the police tipped over a davenport in the living room where they found Amos lying face down. The

---

[1]Amos married Nelson after his arrest and before his trial.

lower part of his sweat pants and his socks were notice-ably wet. Then, the police found wet boots that were partially hidden between the mattress and box spring of a bed in a bedroom of the Nelson residence. The Stough-ton police arrested Amos.

At the police station, Amos was advised of his *Miranda* rights.[2] He admitted that he had escaped from Oakhill Correctional Institution on November 8, 1985. He claimed that he had been at the Nelson residence only forty minutes before the police found him, and that his girlfriend, Nelson, did not know he was in her resi-dence. Amos denied any complicity in the burglary at the Anderson residence. Amos was advised that he was charged with armed burglary because of the use of the kitchen knife in the burglary and for the battery of Mrs. Anderson. Amos stated that because of the seriousness of the charges, he had better seek an attorney's advice at which time the interrogation ceased.

The jury found Amos guilty of armed robbery, and the jury's verdict was affirmed by the trial court. He pleaded no contest to the escape charge, which the trial court accepted as voluntarily made. The trial court found him guilty of the escape charge. The trial court sen-tenced Amos to eight years on the armed burglary con-viction consecutive to any sentence he was then serving, with a credit for 726 days for presentence incarceration. For the escape charge, the trial court sentenced him to two years consecutive to the armed burglary sentence and any other previous sentence with a credit of 726 days of presentence incarceration.

The sentence was entered on November 19, 1987. On December 4, 1987, after being notified by a parole/probation agent that Amos was not entitled to any sen-

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

tence credit, the trial court vacated the sentence *sua sponte* without giving notice to Amos and after he had begun serving the armed burglary sentence. The court vacated the sentence, but then reinstated the same consecutive sentences for both charges with the exception that it eliminated the 726 days presentence credit. A different judge, Judge Gerald C. Nichol, heard the motions for sentence modification relief but denied all requests. Further facts will be recited in the body of the decision as needed.

## I. SUPPRESSION OF THE TWO SEARCHES AND SEIZURES

First, Amos argues that the search of the Nelson property, the seizure of his person and the subsequent seizure of the boots were violations of his federal and state rights against illegal searches and seizures.[3] Both the trial and postconviction motion judges held that Amos had no expectation of privacy in Nelson's home at the time of his arrest because he was an escapee of a penal institution.

Despite the statement Amos made to the police at the time of his arrest that he had been at the Nelson residence for only forty minutes before the police found him, Amos testified at trial that he was living at Nelson's home for the two weeks since the day after his escape from Oakhill until the time of his arrest. Amos argues that he had a reasonable expectation of privacy in Nelson's home. The State argues that because he was an escapee at the time of his arrest, he had no expectation of privacy in Nelson's home.

---

[3] *See* United States Const. amend. IV; Wis. Const. art. I, sec. 11.

Warrantless searches of homes are generally per se unreasonable, subject only to a few well-delineated exceptions such as where exigent circumstances exist.[4] The emergency doctrine or exigent circumstances rule is based on police actions that are considered reasonable.[5] The element of reasonableness is supplied by the compelling need to apprehend those responsible for crimes, not the need to secure evidence.[6] Although the evidence in this case was circumstantial, it supplied adequate exigent circumstances to support a warrantless search of Nelson's home.

We agree with and adopt the view of the Second Circuit Court of Appeals that an escapee has no legitimate expectation of privacy in a residence where he or she is hiding from lawful authority at the time of a warrantless exigent circumstances search.[7] As a matter of policy, society is not prepared to recognize an expectation of privacy as reasonable under these circumstances.[8] Thus, the seizure of Amos's person in Nelson's home was

[4]*State v. Pires,* 55 Wis. 2d 597, 603–04, 201 N.W.2d 153, 156–57 (1972) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55 [1971]).

[5]55 Wis. 2d at 604, 201 N.W.2d at 157.

[6]*Id.*

[7]*See United States v. Roy,* 734 F.2d 108, 110–12 (2d cir. 1984), *cert. denied,* 475 U.S. 1110 (1986). This case analyzed whether an escapee has a legitimate expectation of privacy in the passenger compartment or trunk of a car. The second circuit held that there was no legitimate expectation of privacy. *See also United States v. Payner,* 447 U.S. 727, 731 (1980); *Rakas v. Illinois,* 439 U.S. 128, 133–34 (1978); *Jones v. United States,* 362 U.S. 257, 267 (1960).

[8]*Roy,* 734 F.2d at 110–12 (*citing Katz v. United States,* 389 U.S. 347, 361 [1967] (Harlan, J., concurring)).

not unconstitutional, because Amos had no privacy interest in Nelson's home since he was an escapee from a penal institution.

Also, Amos contests the later warrantless reentry and retrieval of his wet boots, which were partially hidden between the mattress and box spring of a bed in Nelson's home. Since probable cause and exigent circumstances were present, the police made a warrantless entry without violating Amos's fourth amendment search and seizure rights. Evidence that is reasonably believed to be in imminent danger of removal or destruction is a well-recognized exception justifying warrantless entry allowing immediate police action where there is a " 'compelling need for official action and no time to secure a warrant.' "[9] A reviewing court, when looking at whether exigent circumstances existed, must concern itself with what the police authorities had reason to believe at the time of their entry.[10]

In this case, the record indicates that the police officers were concerned with the fact that the boots were probably still wet and whether the boots had the same waffle or lug pattern on the soles as that found in the snow. The exigent circumstances as noted above made the second warrantless intrusion into Nelson's home necessary. Thus, the search and seizure of the boots was constitutionally proper and the trial court and postconviction motion judges' denial of suppression was proper. This is especially true since an escapee, like Amos, can

[9]*State v. Peardot,* 119 Wis. 2d 400, 404, 351 N.W.2d 172, 175 (Ct. App. 1984) (quoting *Michigan v. Tyler,* 436 U.S. 499, 509 [1978]). *See also United States v. Kulcsar,* 586 F.2d 1283, 1287 (8th Cir. 1978).

[10]*Peardot,* 119 Wis. 2d at 404, 351 N.W.2d at 175.

only reside in the penal institution he or she is sent to and cannot reside anywhere else for purposes of search and seizure protestations.[11]

## II. SUBORNATION OF PERJURY

Next, Amos argues that the trial court abused its discretion in allowing into evidence information concerning his attempt to suborn perjury. Amos contacted a person who he thought would give him an alibi. The conversation was tape recorded and it stated that Amos attempted to purchase a false alibi from "Dave."[12]

Prior to and at trial Amos made *in limine* motions to prohibit the State from employing the tape recorded evidence of the subornation of perjury attempt. Amos argued that the evidence was irrelevant. If the evidence was found to be relevant, Amos argued that the evidence was inadmissible because it was too prejudicial to be received into evidence as it would confuse the jury. Further, he argued that the evidence constituted impeachment by extrinsic evidence on a collateral issue. The State argued that if Amos testified on cross-examination, they would introduce the tape to impeach his credibility to show his consciousness of guilt.

The trial court held that the evidence of the suborning perjury was relevant because it "goes to the defendant's credibility." Thereafter, without waiving

[11]*See Roy,* 734 F.2d at 111 ("an escapee [is] in constructive custody for the purposes of determining his legitimate expectations of privacy").

[12]While in the Dane county jail, Amos discussed his case with a fellow inmate who was a police informant. The police informant advised that he could contact a truck driver named "Dave" who, for a price, would give Amos an alibi for the time of the armed burglary. This fellow inmate telephoned "Dave" who was deputy sheriff David Mahoney.

any appeal rights, Amos and the State filed a stipulation stating: that deputy Mahoney would testify that Amos agreed to give him $500 for his testimony; "that Mahoney called Nelson's home on the date of the Anderson burglary between 4 and 5 p.m.; and, that he spoke with Amos at that time." This stipulation was employed as rebuttal evidence in this case.

Appellate courts will not find an abuse of discretion for receipt of evidence on relevance grounds if there is a reasonable basis for the trial court's determination.[13] Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[14] "The criterion of relevancy is whether the evidence sought to be introduced would shed any light on the subject of inquiry."[15] In *State ex rel. Tingley v. Hanley,* hearsay evidence showing that a defendant attempted to influence the testimony of a co-conspirator to make all the trial stories coincide with the defendant's was found to be relevant and admissible.[16] The court held that the evidence tends " 'to show in some degree a consciousness of guilt.' "[17] Likewise, evidence of an attempt to suborn perjury tended to show in some degree a consciousness of guilt, even though the stipulation stated Amos's protestations of innocence. The evidence identified Amos as

[13]*State v. Denny,* 120 Wis. 2d 614, 626, 357 N.W.2d 12, 18 (Ct. App. 1984).

[14]Sec. 904.01, Stats.

[15]*Rogers v. State,* 93 Wis. 2d 682, 688, 287 N.W.2d 774, 776 (1980).

[16]248 Wis. 578, 583, 22 N.W.2d 510, 512 (1946).

[17]*Id.* (quoting *Scott v. State,* 211 Wis. 548, 556, 248 N.W. 473, 476 [1933]).

the perpetrator of the burglary. This evidence made it more likely that he committed the crime. Thus, it was relevant and the trial court did not abuse its discretion in allowing the stipulation to be read to the jury.

Amos also contends that the use of this evidence constituted extrinsic evidence impeaching his exculpatory testimony. Generally, a witness may not be impeached on the basis of specific instances of collateral facts introduced by extrinsic evidence because such evidence has a tendency to confuse issues, waste time, and focus the jury's attention on trivial matters.[18] But where the extrinsic evidence introduced tends to show corrupt testimonial intent for the case at hand,[19] such as subornation of perjury, which tends to show a consciousness of guilt,[20] then there is no evidentiary proscription for its use. The relevancy of this evidence regarding Amos's other conduct in suborning perjury depends upon its nearness in time, place, and circumstances to the alleged crime.[21]

The attempt to suborn perjury occurred while this action was pending and, as such, is available to the State to show consciousness of guilt even though this was extrinsic evidence of collateral facts. The trial court's ruling allowing the use of this evidence was not an abuse of discretion.

---

[18]Secs. 904.03 and 906.08(2), Stats. *State v. Sonnenberg,* 117 Wis. 2d 159, 176, 344 N.W.2d 95, 103 (1984).

[19]3A J. Wigmore, *Evidence* sec. 1005(c) (Chadbourne rev. ed. 1970); 4 J. Wigmore, *Evidence* sec. 1070 (Chadbourne rev. ed. 1972).

[20]*See supra* note 17 and accompanying text.

[21]*Sonnenberg,* 117 Wis. 2d at 172, 344 N.W.2d at 101.

Next, Amos argues that the receipt of evidence of other crimes—the subornation of perjury attempt—was error because other crimes evidence cannot be utilized to prove the character of the defendant. This type of testimony is not excluded if proffered to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[22] This statutory listing of other wrongs or acts is not exclusive or exhaustive, but is illustrative.[23] The evidence of an attempt to suborn perjury was admissible to show a consciousness of guilt of the principal criminal charge.[24] The trial court did not err in allowing the stipulation of the subornation of perjury statement into evidence.

Finally, Amos argues that this "other crimes" evidence was so prejudicial that it undermined Amos's constitutional right to a fair trial. Trial courts and this court must apply a two-step analysis to determine whether "other acts" evidence is admissible. First, the court must find that the evidence fits within one of the exceptions to sec. 904.04(2), Stats.[25] Second, the court must employ discretion to determine under sec. 904.03, Stats., whether the probative value outweighs any prejudice resulting from such evidence.[26] If the trial court fails to follow this procedure, the appellate court "must independently review the evidence to determine if it supports the

[22]Sec. 904.04(2), Stats.

[23]*State v. Shillcutt*, 116 Wis. 2d 227, 236, 341 N.W.2d 716, 720 (Ct. App. 1983).

[24]*State v. Bettinger*, 100 Wis. 2d 691, 698, 303 N.W.2d 585, 589 (1981).

[25]*State v. Conley*, 141 Wis. 2d 384, 399–400, 416 N.W.2d 69, 75 (Ct. App. 1987).

[26]*Id.*

trial court's decision to admit the other acts evidence."[27]

We note that the trial court failed to follow this two-step analysis. We have already determined that the subornation of perjury evidence fits within one of the exceptions to sec. 904.04(2), Stats., since this evidence shows Amos's consciousness of guilt.

Under the second prong of the two-step analysis, we hold that the probative value of the evidence far outweighs any prejudice resulting from such evidence for two reasons. First, the prejudice of the subornation evidence was ameliorated by the other facts noted in the stipulation. Those facts included: Amos advised "Dave" that he did not commit the burglary, that he was only doing it because he was scared that he would be convicted, and that another person committed the crime. All of these facts were consistent with Amos's trial testimony. Second, in the trial court's instructions to the jury, the court gave the jury a cautionary instruction. The instruction was not directed specifically to this evidence, yet it was sufficiently broad and general to apply to this evidence.

## III. CONFRONTATION RIGHTS

Next, Amos contends that he was denied his right to a fair trial. First, Amos argues that the trial court refused to allow defense witness Barry Livingston (Livingston) to testify concerning a jail house conversation because it was hearsay. Second, Amos also argues that the trial court erred in refusing to allow testimony of attorney Ted N. Frank (Frank) or use of a letter written by Frank

---

[27]*Id.* at 400, 416 N.W.2d at 75. *See State v. Shillcutt,* 116 Wis. 2d 227, 235–36, 341 N.W.2d 716, 719–20 (Ct. App. 1983).

to Amos declining representation of Amos in this case due to a conflict of interest.

The fundamental right of a defendant to present witnesses on one's own behalf is based on the due process clause of the fourteenth amendment and the sixth amendment's right to compel witnesses on one's own behalf to defend against the state's accusations.[28] Under these circumstances, the hearsay rule may not be employed mechanistically[29] where the proffered testimony is critical to the defense and bears persuasive assurances of trustworthiness.[30]

In this case, the trial court refused to allow Livingston to testify that another cellmate (who was also a police informant) told Amos: "Dan you are in trouble. You are going to lose the trial. You better get yourself some help. I have an alibi witness I can get for you." The trial court did allow Livingston to testify that Amos appeared nervous as a result of the conversation. The trial court's evidentiary ruling in refusing to allow the above hearsay into evidence was a mechanistic employment of the hearsay rule. The trial court erred because Amos was not trying to prove the truth of the above statement through Livingston's testimony. Rather, he was trying to show that the statements were made and what Livingston noted as Amos's reaction to the statements. " 'The hearsay rule does not prevent a witness from testifying as to what he heard; it is rather a restriction on the proof of fact through extrajudicial

---

[28]*See Chambers v. Mississippi,* 410 U.S. 284, 294–98 (1973).

[29]*Id.* at 302.

[30]*Id; State v. Sharlow,* 110 Wis. 2d 226, 233, 327 N.W.2d 692, 696 (1983).

statements.' "[31]

Even though the trial court erred in refusing to allow Livingston to testify concerning what he had heard, the jury did hear his testimony that Amos was nervous and upset as a result of the conversation. This testimony may corroborate Amos's testimony that he felt pressured by the cellmate's statements. Yet, it does not in any way exculpate Amos from his attempt to bribe someone to give him an alibi for the time that the burglary occurred on November 23, 1985. Thus, even though the trial court erred in its evidentiary ruling, such error was not so critical to his defense as to deny him a fair trial.[32]

Amos also argues that the trial court denied him a fair trial when it denied him the right to have Frank testify on his behalf, and when it denied the receipt into evidence of a letter Frank wrote to Amos refusing to represent him because of a conflict of interest. The letter was hearsay.[33] Frank could not testify to privileged information without his former client's acquiescence,[34] and such testimony would involve a violation of the rules of professional conduct for attorneys by Frank.[35] Therefore, the trial court did not err in not allowing Frank to testify or in refusing to allow the letter into evidence.

---

[31] *State v. Curbello-Rodriguez,* 119 Wis. 2d 414, 427, 351 N.W.2d 758, 765 (Ct. App. 1984) (quoting *Dutton v. Evans,* 400 U.S. 74, 88 [1970]).

[32] *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867 (1982); *Sharlow,* 110 Wis. 2d at 235, 327 N.W.2d at 697.

[33] *See* sec. 908.01(3), Stats.

[34] *See* sec. 905.03(3), Stats.

[35] *See* S.C.R. 20.22 (1986).

## IV. THEORY OF DEFENSE

Amos next contends that the trial court committed reversible error because it refused to accept his proposed written instruction tendered at the beginning of the trial. Further, Amos argues that the trial court also erred when it rejected the amended theory of defense instruction made during the trial that Ralph Axelson committed the burglary.

A trial court has wide discretion in presenting instructions to the jury. If its instructions adequately cover the law applied to the facts, a reviewing court will not find error in refusing special instructions even though the refused instructions would not be erroneous.[36] A defendant is entitled to an instruction on a valid theory of defense,[37] but not to an instruction that merely highlights evidentiary factors.[38] Such instructions are improper, and trial courts are correct if they reject them.[39]

The trial court employed Wisconsin Jury Instruction—Criminal 141 which states: "The identification of the defendant is in issue in this case . . .. If you find that the crime alleged was committed, before you may find the defendant guilty, you must be satisfied beyond a reasonable doubt that the defendant is the person who committed the crime." That is a correct statement of the

[36]*State v. Roubik,* 137 Wis. 2d 301, 308–09, 404 N.W.2d 105, 108 (Ct. App. 1987).

[37]*Turner v. State,* 64 Wis. 2d 45, 51, 218 N.W.2d 502, 505 (1974).

[38]*See State v. Pruitt,* 95 Wis. 2d 69, 81, 289 N.W.2d 343, 348–49 (Ct. App. 1980).

[39]*Id.*

law on the subject of identification. While Amos is entitled to a theory of defense instruction, he is not entitled to the instructions he requested because they improperly highlighted evidentiary matter. The trial court was correct to reject the proffered instructions.

## V. RESENTENCING

On November 19, 1987, Judge William D. Byrne, sentenced Amos to eight years on the burglary charge and two years on the escape charge, both consecutive to each other and consecutive to a preexisting sentence Amos was then serving. Judge Byrne also gave Amos 726 days presentence incarceration credit to both sentences. Both sentences were consecutive to the burglary sentence he was then serving, which the trial court recognized would be completed on November 24. On November 23, a probation/parole agent wrote to Judge Byrne informing him that Amos was not entitled to any presentence incarceration credit. On December 4, without notice to Amos and without any hearing, the trial court *sua sponte* entered an amended order vacating the original sentence and resentencing Amos to the same sentence without the 726 days presentence incarceration credit. This occurred after Amos commenced serving the burglary sentence involved in this case.

On July 22, 1988, Judge Nichol heard Amos's postconviction motion for sentence modification to reinstate the 726 day presentence incarceration credits. Judge Nichol denied the motion but he found that Amos was entitled to five days presentence incarceration credit. This credit was based on the five days that Amos was held on bond on the charges of burglary and escape after his maximum release date for the previous burglary sentence he was serving.

On this appeal, Amos argues that Judge Byrne violated his due process rights in resentencing him *sua sponte* without notice and hearing. Amos further argues that Judge Byrne punished him twice for the same crime in violation of double jeopardy under both the federal and state constitutions. It is to be noted that Amos never argued he was entitled to any presentence incarceration credit other than a conclusory statement in the appellate brief that Judge Byrne appropriately determined the sentence credit that was initially given.

## A. Sentence Credit

A convicted person should be given sentence credit for presentence incarceration for time spent in custody in connection with the course of conduct for which sentence was imposed.[40] But, he is to be given no presentence credit for incarceration time that is unrelated to the crimes presently charged.[41]

Amos was arrested on charges of burglary and escape on November 23, 1985. He was convicted on the burglary charge on August 28, 1987, and on the escape charge on August 31, 1987. He was sentenced for those crimes on November 19, 1987. At the time of the initial bail hearing for the burglary and escape charge, he was completing a sentence for a previous burglary conviction for which he was incarcerated at Oakhill. The record reflects that Amos did not complete the sentence for that earlier burglary until November 24, 1987. The completion of the prison sentence for that previous burglary

---

[40]Sec. 973.155(1), Stats.

[41]*See State v. Beets,* 124 Wis. 2d 372, 369 N.W.2d 382 (1985); *State v. Gavigan,* 122 Wis. 2d 389, 362 N.W.2d 162 (Ct. App. 1984).

sentence was completely unrelated to the burglary or escape charge involved in this case. Therefore, he was not entitled to any statutory presentence incarceration credit for being jailed from the time of his arrest on the charges involved in this case until the time he was sentenced for those charges, except for the above noted five days.

With respect to Amos's claim that Judge Byrne denied him his due process rights because he received no notice of hearing concerning the modification of his sentence, we note that Amos's argument is correct on this point. Amos, however, did receive due process with his postconviction motion where he was given an opportunity to be heard " 'at a meaningful time and in a meaningful manner.' "[42] On the postconviction motion, his arguments against elimination of the presentence incarceration credit were completely aired on the record before a trial court. The order denying the modification request was accomplished in a meaningful manner because if he were entitled to reinstatement of his 726 days of presentence incarceration credit, which he was not, reinstatement of the original trial court sentence would have been timely.

B. Double Jeopardy

Amos next contends that the *sua sponte* elimination of the 726 days of presentence incarceration credit violated his double jeopardy rights. Under the double jeopardy clause, no punishment can be increased once

---

[42]*Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552 [1965]).

that person has commenced serving sentence.[43] "Modification to correct sentencing flaws runs afoul of the double jeopardy provisions when the amending court seeks to increase sentences already being served."[44]

The trial court's sentence modification eliminating the original 726 days of presentence incarceration occurred after Amos had commenced the burglary sentence involved in this case, therefore, double jeopardy proscripts were implicated. But in this case, the sentence was modified to eliminate presentence incarceration credit that he was not entitled to and the same sentence existed before the modification as after. Thus, double jeopardy was not implicated.

Finally, Amos argues that because of the State's acquiescence in the 726 days of presentence credit at trial, the State's conduct should serve as an equitable bar to sentence modification because of waiver.[45] Because there is no factual dispute that Amos was not entitled to 726 days of credit, it would be absurd to impose some form of equitable relief on a waiver ground to allow a *per se* wrong sentence credit to stand.

*By the Court.*—Judgments and orders affirmed.

FINE, J. (concurring). I write separately for two reasons. First, to explain my rationale for joining in the court's decision on the critical issue of whether the exclusionary rule, crafted to vindicate Fourth Amendment rights, *Stone v. Powell,* 428 U.S. 465, 482–483 (1976), should be expanded to shelter an escaped con-

---

[43]*United States v. Benz,* 282 U.S. 304, 307 (1931).

[44]*State v. North,* 91 Wis. 2d 507, 509–10, 283 N.W.2d 457, 458–59 (Ct. App. 1979).

[45]*See Struzik v. State,* 90 Wis. 2d 357, 367–68, 279 N.W.2d 922, 926–27 (1979).

vict. Second, the majority's discussion of *Chambers v. Mississippi,* 410 U.S. 284 (1973), is unwarranted.

## I.

Amos' challenge to the entries of Nelson's home and the seizure of his property presents an issue of first impression in Wisconsin.[1] Resolution of that issue requires an analysis of the interests the Fourth Amendment was designed to protect.

The fundamental purpose of the Fourth Amendment's prohibition against unreasonable searches and seizures, and the counterpart found in article I, section 11 of the Wisconsin Constitution, is to protect "the privacy and security of individuals against arbitrary invasions by government officials." *State v. Boggess,* 115 Wis. 2d 443, 448–449, 340 N.W.2d 516, 520 (1983). The exclusionary rule that bars trial use of evidence obtained in violation of the Fourth Amendment is a judicially-constructed mechanism designed to deter illegal police activity, *United States v. Janis,* 428 U.S. 433, 446 (1976); *Linkletter v. Walker,* 381 U.S. 618, 636–637 (1965), though empirical support for the rule's efficacy in that regard is problematic. *Janis,* 428 U.S. at 449–454. What is clear, however, is that imposition of the exclusionary rule "exacts a substantial social cost" since

[1] Although arguing that his arrest was unlawful, Amos does not contend that the trial court lacked personal jurisdiction over him. *See State v. Smith,* 131 Wis. 2d 220, 236, 388 N.W.2d 601, 608 (1986) ("A defendant cannot claim immunity from prosecution 'simply because his appearance in court was precipitated by an unlawful arrest,' nor does an illegal arrest serve as a defense to a valid conviction." [quoting *United States v. Crews,* 445 U.S. 463, 474 (1980)]). Rather, he contends that the fruits of the entries should be suppressed. *See Smith,* 131 Wis. 2d at 240–241, 388 N.W.2d at 610.

"[r]elevant and reliable evidence is kept from the trier of fact and the search for truth at trial is deflected." *Rakas v. Illinois,* 439 U.S. 128, 137 (1978). Indeed, since the exclusionary rule kicks in only when evidence of crime is uncovered, it "only benefits a person incriminated by illegally obtained evidence," Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U. Chi. L. Rev. 665, 736 (1970), "and often frees the guilty." *Stone v. Powell,* 428 U.S. at 490.[2] Thus, there are—appropriately—serious "misgivings as to the benefit of enlarging the class of persons who may invoke [the exclusionary] rule." *Rakas,* 439 U.S. at 138. *Cf. State v. Rush,* 147 Wis. 2d 225, 230, 432 N.W.2d 688, 691 (Ct. App. 1988) ("Applying the exclusionary rule to sentencing would also unduly restrict a trial court's access to a broad range of evidence in determining a proper sentence."). These misgivings are legitimate considerations in our analysis of whether the rule's scope should be expanded to protect Amos. *See Rakas,* 439 U.S. at 138.

It is now settled that " 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted,' " *Id.* at 133–134 (quoting *Alderman v. United States,* 394 U.S. 165, 174 [1969]), because "[c]onferring standing to raise vicarious Fourth Amendment claims would necessarily mean a more widespread invocation of the exclusionary rule during criminal trials," *Id.* at 137. Thus, Amos may not assert Nelson's interest in the "privacy and security," *Boggess,* 115 Wis. 2d at 448, 340 N.W.2d at 520, of her home. Rather, the critical question here is whether the

---

[2]Innocent persons subjected to illegal searches gain no succor from the exclusionary rule irrespective of how flagrant and outrageous the Fourth Amendment violation, *see* Oaks, 37 U. Chi. L. Rev. at 736–739; it offers them no "[r]eparation" for their "ruptured privacy." *See Linkletter,* 381 U.S. at 637.

police entry into Nelson's home "has infringed an interest of [Amos that] the Fourth Amendment was designed to protect," *see Rakas,* 439 U.S. at 140, that is, whether the entry "invaded *his* legitimate expectation of privacy," *see United States v. Payner,* 447 U.S. 727, 731 (1980) (emphasis in original).[3]

In order for an expectation of privacy to be "legitimate," there must be "more than a subjective expectation of not being discovered." *Rakas,* 439 U.S. at 143 n. 12. A person who is on the searched premises unlawfully has no "legitimate" expectation of privacy in those premises. *Id.* at 143–144 n. 12 ("A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified expectation of privacy, but it is not one which the law recognizes as 'legitimate.' ").

When the police entered Nelson's home, Amos was a fugitive from justice; he was not lawfully in Nelson's home. *See United States v. Roy,* 734 F.2d 108, 110–111 (2d Cir. 1984). Indeed, he could not lawfully be *any* place but the institution from which he had escaped. *Id.* at 111. He had no "legitimate expectation of privacy" in Nelson's home, *see Payner,* 447 U.S. at 731, and thus the exclusionary rule gives him no refuge, *see Jones v. United States,* 362 U.S. 257, 267 (1960) (The exclusionary rule may not be asserted by "those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched."), *overruled on other grounds, United States v. Salvucci,* 448 U.S. 83 (1980) (rejecting the automatic standing rule in *Jones*). *Cf. Griffin v. Wisconsin,* 483 U.S. 868 (1987) (A probationer in legal custody of Department of Health and Social Services is subject to warrantless search of his home by probation

---

[3]Prior to *Rakas,* this analysis was a "standing" inquiry. *Rakas,* 439 U.S. at 140; *State v. Fillyaw,* 104 Wis. 2d 700, 710, 312 N.W.2d 795, 800 (1981), *cert. denied,* 455 U.S. 1026 (1982).

officer pursuant to department regulations found reasonable under Fourth Amendment.). The trial court properly held that the exclusionary rule did not bar receipt of the evidence seized in Nelson's home.

## II.

The majority's discussion of *Chambers* is superfluous. A *Chambers* analysis is appropriate only when a defendant's theory of defense is stymied by the mechanistic application of a technical rule of hearsay. *See* 410 U.S. at 302. Here, as the majority recognizes, majority at 276, Livingston's testimony about what Amos' cellmate told Amos was *not* hearsay because it was not being introduced for the truth of its assertion. *See* Rule 908.01(3), Stats. *Chambers* is not material to our decision.